# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 15 |
| PREMIER ASSURANCE<br>GROUP SPC LTD., | Case No. 20-20230-RAM |
| Debtor in a Foreign Proceeding.<br>_____/ | |
| JEFFREY STOWER and JASON ROBINSON, as<br>Foreign Representatives of PREMIER ASSURANCE<br>GROUP SPC LTD, | |
| Plaintiffs, | |
| v. | Adv. No. ___-_____-RAM |
| LEONARDO L. CORNIDE, individually and as<br>Trustee of The Falcon Family Irrevocable Trust,<br>JORGE E. FALCON individually and as Trustee of<br>The Cornide Family Irrevocable Trust, JAVIER<br>JIMENEZ (also known as JAVIER JIMENEZ, JR.),<br>ANDRES ALOS, MARIA SARDUY, as Trustee of the<br>Andres Alos Family Irrevocable Trust, SILVERBACK<br>CAPITAL PARTNERS LLC, BEAST CAPITAL LLC,<br>117 ALBATROSS LLC, 301 DALE LLC, 900 DALE<br>LLC, 975 DALE LLC, PREFERRED BUSINESS<br>SERVICES INC., PA MARKETING LTD., 45 SBH<br>LLC, 1736 SBH LLC, 2000 SBH LLC, 2170 SBH<br>LLC, 74560 SBH LLC, SILVERBACK<br>INVESTMENTS LLC, 248 SILVERBACK<br>INVESTMENTS LLC, 1901 SILVERBACK<br>INVESTMENTS LLC, 1919 SILVERBACK<br>INVESTMENTS LLC, SILVERBACK EQUITY<br>PARTNERS LLC, SILVERBACK MANAGEMENT<br>SERVICES LLC, SBH MANAGEMENT SERVICES<br>LLC, SILVERBACK MIDTOWN, LLC,<br>SILVERBACK VENTURES LLC, and DOES 1-10, | **COMPLAINT FOR<br>COMPENSATORY,<br>PUNITIVE AND TREBLE<br>DAMAGES, IMPOSITION<br>OF CONSTRUCTIVE<br>TRUST, AND OTHER<br>RELIEF** |
| Defendants.<br>_____/ | |

# **Table of Contents**

I.      NATURE OF THIS ACTION ................................................................................ 2

II.     JURISDICTION AND VENUE ........................................................................... 8

III.    THE PARTIES ...................................................................................................... 8

IV.     PROCEDURAL BACKGROUND ..................................................................... 15

V.      GENERAL FACTUAL ALLEGATIONS .......................................................... 16

    A.      Corporate and Business Background of the Debtor ................................. 16

    B.      Corporate and Business Background of SBCP ........................................ 21

    C.      The SBCP Notes ..................................................................................... 21

    D.      The Debtor's Misappropriated Funds Are Used For the Benefit of the Silverback Affiliates, the Family Trusts, Alos, and Ultimately the Founder Defendants, and Dissipated in Speculative Trading ........................................................... 27

        1.      The Silverback Affiliates Amass a Real Estate Portfolio with the Debtor's Funds ....................................................................................................... 27

        2.      The Bouncing Ball of SBCP Loans ............................................... 30

        3.      The Founder Defendants, Beast Capital and SMS Siphon the Debtor's Funds through SBCP ....................................................................... 30

        4.      Realized Ill-Gotten Gains from the Purchase and Sale of Real Estate by Silverback Affiliates and Other Entities ........................................ 30

    E.      The SEC Orders and the Round Trip Transactions ................................. 31

    F.      It Only Gets Worse From There: SBCP's "SPECULATIVE" Securities Trading Losses ..................................................................................................... 36

    G.      Results of the Debtor's "Investment" in SBCP ...................................... 38

VI.     CLAIMS FOR RELIEF ...................................................................................... 39

    COUNT I      VIOLATIONS OF FEDERAL RICO STATUTE,18 U.S.C. § 1962(c) ................................................................................................................. 39

    PREDICATE VIOLATIONS .................................................................... 43

    Violations of Federal Criminal Wire Fraud (18 U.S.C. § 1343) ................................. 43

    Violations of Federal Bank Fraud Statute (18 U.S.C. §1344) .................................... 45

    Money Laundering (18 U.S.C. §1957) ....................................................................... 46

Interstate and Foreign Transportation In Aid of Racketeering Enterprises (18 U.S.C §1952) ................................................................ 46

Interstate and Foreign Transportation of Stolen Monies (18 U.S.C. §2314) .............. 47

COUNT II      CONSPIRACY TO VIOLATE FEDERAL RICO STATUTE, 18 U.S.C. §1962(d) ................................................................ 48

COUNT III     VIOLATION OF FLORIDA CIVIL RICO, Fla. Stat. § 772.103 ....... 48

COUNT IV      BREACHES OF FIDUCIARY DUTY UNDER CAYMAN ISLANDS LAW ................................................................ 50

COUNT V       UNLAWFUL MEANS CONSPIRACY UNDER CAYMAN ISLANDS LAW ................................................................ 53

COUNT VI      KNOWING RECEIPT AND/OR EQUITABLE PROPRIETARY CLAIMS UNDER CAYMAN ISLANDS LAW ................................ 55

COUNT VII     DISHONEST ASSISTANCE UNDER CAYMAN ISLANDS LAW 57

COUNT VIII    USURPATION OF CORPORATE OPPORTUNITY UNDER FLORIDA LAW ................................................................ 60

COUNT IX      CIVIL THEFT UNDER SECTION 772.11, FLA. STAT. ................. 62

COUNT X       CONVERSION UNDER FLORIDA LAW ........................................ 64

COUNT XI      CONSTRUCTIVE FRAUD UNDER FLORIDA LAW ................... 65

COUNT XII     UNJUST ENRICHMENT UNDER FLORIDA LAW ...................... 66

COUNT XIII    IMPOSITION OF CONSTRUCTIVE TRUST UNDER FLORIDA LAW ................................................................ 67

COUNT XIV     ACCOUNTING ................................................................ 68

COUNT XV      PRELIMINARY AND PERMANENT INJUNCTION UNDER SECTION 895.05, FLA. STAT. ........................................................ 70

VII.   STATEMENT OF RELIANCE ON FOREIGN SOURCES OF LAW ............................. 72

VIII.  RESERVATION OF RIGHTS ................................................................ 72

IX.    PRAYER FOR RELIEF ................................................................ 73

EXHIBITS ................................................................ 78

Plaintiffs, Jeffrey Stower and Jason Robinson, in their capacity as the duly authorized and appointed Foreign Representatives and Joint Official Liquidators (the "Foreign Representatives" or "JOLs") of the Debtor, Premier Assurance Group SPC Ltd. (the "Debtor"), sue the following persons (collectively the "Defendants"):

(i)    Leonardo L. Cornide, individually ("Cornide") and as Trustee of The Falcon Family Irrevocable Trust (the "Falcon Family Trust"), and Jorge E. Falcon individually ("Falcon," and together with Cornide, the "Founder Defendants") and as Trustee of The Cornide Family Irrevocable Trust (the "Cornide Family Trust");

(ii)   Javier Jimenez also known as Javier Jimenez, Jr. ("Jimenez," and together with the Founder Defendants, the "Insider Defendants");

(iii)  Andres Alos ("Alos");

(iv)   Maria Sarduy, as Trustee of the Andres Alos Family Irrevocable Trust (the "Alos Family Trust," and collectively with the Cornide Family Trust and Falcon Family Trust, the "Family Trusts");

(v)    Silverback Capital Partners LLC ("SBCP");

(vi)   Beast Capital LLC ("Beast Capital");

(vii)  117 Albatross LLC ("117 Albatross"); 301 Dale LLC ("301 Dale"); 900 Dale LLC ("900 Dale"); 975 Dale LLC ("975 Dale"); Preferred Business Services Inc. ("PBS"); PA Marketing Ltd. ("PAM"); 45 SBH LLC ("45 SBH"); 1736 SBH LLC ("1736 SBH"); 2000 SBH LLC ("2000 SBH"); 2170 SBH LLC ("2170 SBH"); 74560 SBH LLC ("74560 SBH"); Silverback Investments LLC ("SBI"); 248 Silverback Investments LLC ("248 SBI"); 1901 Silverback Investments LLC ("1901 SBI"); 1919 Silverback Investments LLC ("1919 SBI"); Silverback Equity Partners LLC ("SBEP"); Silverback Management Services LLC ("SMS"); SBH

Management Services LLC ("SBH Management Services"); Silverback Midtown, LLC ("SB Midtown"); Silverback Ventures LLC ("SBV") (collectively, the "Silverback Affiliates"); and

(viii)   Does 1-10 (the "Doe Defendants").

As grounds for the relief sought against the Defendants in this Complaint, Plaintiffs allege as follows:

## I.
## NATURE OF THIS ACTION

1.    This adversary proceeding seeks legal and equitable relief arising out of the fraudulent, undisclosed, unlawful and manipulative activities by the Insider Defendants to misappropriate tens of millions of dollars of assets from the Debtor for the ultimate use and benefit of the Founder Defendants and Family Trusts, in violation of their legal and fiduciary obligations to the Debtor under applicable United States and Cayman Islands law. Through their control and domination of the Debtor and its affiliates, of which the Founder Defendants directly or indirectly owned 100% of the equity interests, and their executive positions with those entities, the Insider Defendants engaged in a pattern and practice of activity in violation of the civil and criminal laws of the United States and the laws of the Cayman Islands.

2.    The Insider Defendants planned and carried out these activities and achieved their objectives through their control over the tens of millions of dollars of funds paid by participants and members in investment and insurance plans created and sold through the Debtor's two segregated portfolios, Premier Assurance Segregated Portfolio ("PASP") and Global Assurance Segregated Portfolio ("GASP"). In willful and conscious disregard of their legal and fiduciary obligations and the promises made to those participants regarding the prudent use and protection of their funds, the Insider Defendants diverted a significant portion of those funds into and through a separate, conduit entity ultimately owned by Defendants Falcon and Cornide and controlled by

the Founder Defendants and Defendant Jimenez for the benefit of the Founder Defendants and their Family Trusts, to the detriment of the Debtor and the participants of PASP and the policyholders of GASP.

3.      As more fully described below, the Insider Defendants looted and diverted funds from the Debtor's PASP portfolio, directly and indirectly through PAG LLC and another affiliate, Lyncpay LLC ("Lyncpay"), to Silverback Capital Partners, LLC ("SBCP"), the primary vehicle and conduit for their fraudulent activities. These amounts were then transferred onward to other persons and entities related to or under the control of the Founder Defendants, for various purposes that were intended to benefit and did benefit the Founder Defendants and other Defendants, all to the detriment and loss of the Debtor. The general pattern of these multi-step transfers, numbering well over a hundred during the period covered by this Complaint, is depicted in the schematic diagram attached hereto as Exhibit A (the "Funds Flow Chart").

4.      Over a period of several years from at least 2015 through 2020, SBCP , received well in excess of $28,055,783.02 of the Debtor's funds denominated as "loans" pursuant to a series of sham promissory notes (collectively, the "SBCP Notes," as defined and described more particularly below). As the full context of the SBCP Notes is explained, it will become clear that the dozens of advances made to and through SBCP under the false cover of the SBCP Notes (the "SBCP Loan Proceeds") functioned as a "heads we win, tails you lose" arrangement that left all of the risk of loss with the Debtor while the Founder Defendants usurped and realized enormous gains, benefits and profits in Florida real estate for themselves and other Defendants, as well as through other diversions of the funds advanced under those Notes.

5.      The four SBCP Notes required no periodic payments of principal or interest, contained no enforceable provisions relating to default or acceleration, were never secured by

collateral nor backed by personal guarantees, and each successive Note postponed the maturity date -- all for the personal financial benefit of the Founder Defendants who controlled both SBCP as maker and the Debtor as payee. Thus, for all intents and purposes, rather than create any meaningful legal obligation to repay, the perpetually extended SBCP Notes amounted to and were treated as nothing more than a "rolling option" to repay tens of millions of dollars diverted from the Debtor by the Insider Defendants for the Founder Defendants to pursue speculative real estate investment and realize millions of dollars of personal gains.

6.    Examples of the misappropriation and self-dealing engaged in by the Insider Defendants through the sham and artifice of the SBCP Notes include the following:

a.    SBCP Loan Proceeds in the aggregate amount of more than $25,998,417.36 were "on-loaned" to the Silverback Affiliates owned and controlled by the Founder Defendants and/or Alos, at higher interest rates than that "owed" by SBCP to the Debtor under the SBCP Notes (a form of interest rate arbitrage benefiting SBCP at the expense of the Debtor), for the purchase of real estate investment properties with an aggregate value that grew to exceed $50 million, of which properties still owned by the various Defendants at the time of filing this Complaint exceed $24,749,700;

b.    Of the foregoing SBCP Loan Proceeds, an aggregate amount of more than $3,538,584.39 was transferred to or for the benefit of the Founder Defendants to acquire vacation properties for themselves in the Florida Keys through Defendants 248 SBI, and 117 Albatross, without promissory notes or other loan or explanatory documentation;

4

c.    SBCP Loan Proceeds were transferred directly to the Founder Defendants, without adequate disclosure to auditors, regulatory authorities and investors, and without undertaking any binding and legal obligation to repay the Debtor for sums so advanced, to Defendant Cornide in an amount not less than $2,004,072, and to Defendant Falcon in an amount not less than $1,458,680;

d.    SBCP Loan Proceeds were transferred to other affiliated entities owned and controlled by the Founder Defendants, not for legitimate business purposes of the Debtor, but for the Founder Defendants' own personal use or benefit, as follows:

    i.    to Defendant Beast Capital in the amount of $402,897.95;

    ii.    to Defendant SMS in the amount of $1,828,268.66, a significant portion of which was used to make improvements to Defendant Falcon's and Defendant Cornide's personal residences under the guise of "Project Patio" and "Project Garden View";

    iii.    to Defendant SBH Management Services in the amount of $131,768.77

    iv.    to Defendant PBS and Defendant PAM in the amount of $2,000,000;

    v.    to the Defendant Family Trusts in the amount of $53,608;

    vi.    at least $309,550 related to the purchase of a boat;

    vii.    at least $28,500 to other entities owned or controlled by and for the benefit of the Founder Defendants; and

viii.    at least $464,905.58 was paid to a development company with respect to the development of Defendant Falcon's primary residence.

e.    SBCP Loan Proceeds, or funds generated from the use and investment of those Proceeds, were caused by the Insider Defendants to be invested in ultra-high risk, speculative securities transactions with Jefferies Group LLC that resulted in $4.783 million in losses unrecoverable to the Debtor; and

f.    In a maneuver that will be described more fully below as the "Round Trip Transactions," the Founder Defendants misappropriated funds that originated from premiums paid by PASP's participants, the SBCP Loan Proceeds, or funds generated from the use and investment of those Proceeds, to pay at least $5.3 million of the amount they were *personally obligated* to pay to the SEC Fair Fund under an SEC Consent Order requiring restitution for the benefit of the Debtor.

7.    As described above, the largest share of the SBCP Loan Proceeds were diverted through the "on-loans" made by SBCP to the Silverback Affiliates. In connection with those further loans, the SBCP Notes called in part for SBCP to furnish the Debtor with certain collateral from SBCP and the Silverback Affiliates (the "Collateral Package"), and in one instance, personal guarantees from the Founder Defendants (the "Founder Guarantees"). Specifically, the Collateral Package was to include pledges by SBCP to the Debtor of mortgages (the "SBCP Mortgages") that were to be granted to SBCP by the Silverback Affiliates, which as indicated were owned and/or controlled at all relevant times by at least one, if not both, of the Founder Defendants and/or Alos.

6

8.      In actuality, the Collateral Package was never provided, and even where certain of the Silverback Affiliates executed and delivered notes and mortgages to SBCP no perfected, enforceable form of lien or security interest over those obligations ever was granted in favor of the Debtor over the period dating back to the first of the SBCP Notes in February of 2015. Nor were any Founder Guarantees ever executed or delivered to the Debtor; indeed, even shortly after execution of the 2017 Note (defined below) that called for those Guarantees to be executed and delivered, the idea was never taken seriously by Defendant Jimenez, who as Chief Financial Officer ("CFO") of the Debtor bore the primary responsibility to see that its financial interests were properly protected.

9.      Given these circumstances, _exactly none_ of the dozens of transfers described above was consistent with the stated purpose set forth in each of the SBCP Notes, "of financing high yielding securitized projects with low financial risk." Rather, the goal and purpose of each such transfer was to usurp the real estate and other investment opportunities to enrich the Founder Defendants and Family Trusts through the use of the Debtor's funds, under an arrangement that limited the Debtor to the contingent repayment of the SBCP Loan Proceeds at an interest rate that was lower than the rate at which the "on-loans" were made to the Silverback Affiliates. That interest rate disparity existed despite the fact that in many instances these subsequent loans were secured by mortgages or other enforceable interests in favor of SBCP, and thus posed a lower risk to SBCP than the unsecured SBCP Notes posed to the Debtor. Again here, it was the Founder Defendants who benefited from the interest rate arbitrage, through their ultimate ownership or control of SBCP.

10.      These fraudulent and deceptive practices through which the Founder Defendants used the Debtor as their own personal "piggy bank" under the cover of the SBCP Notes continued

until September 2020, when the Cayman Islands Monetary Authority ("CIMA") appointed Plaintiffs as Joint Controllers of the Debtor to assume control of its affairs from September 14, 2020. Even after the Foreign Representatives took control over the Debtor, these fraudulent and deceptive practices and efforts to avoid repayment of the obligations under the SBCP Notes continued through SBCP and the Silverback Affiliates.

11.     As recently as July 2021, months after the appointment of the JOLs, the recognition of their appointment as Foreign Representatives of the Debtor and the entry of provisional and final relief by this Court, the Insider Defendants have continued to engage in transfers of cash and interests in real property derived from the funds misappropriated from the Debtor.

12.     As a result of these fraudulent and illegal activities, the Defendants have been unjustly enriched at the expense of the Debtor referable to PASP, which has been rendered insolvent and unable to meet the claims of participants in the PASP portfolio in full.

## II.
## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this adversary proceeding pursuant to sections 157 and 1334 of Title 28 of the United States Code, section 1964 of Title 18 of the United States Code, section 1331 of Title 28 of the United States Code, and section 1367 of Title 28 of the United States Code.

14.     Venue is proper in this District pursuant to section 1409 of Title 28 of the United States Code, because the underlying Chapter 15 case involving the Debtor is pending in this District.

## III.
## THE PARTIES

15.     Plaintiff Jeffrey Stower is an individual residing in the Cayman Islands who has been appointed by the Grand Court of the Cayman Islands (the "Cayman Court") as a Joint Official

Liquidator of the Debtor in FSD Cause No. 264 of 2020 (ASCJ) (the "Cayman Proceeding"), and been recognized by this Court as one of the Debtor's Foreign Representatives in the underlying Chapter 15 case in which this adversary proceeding is filed. Mr. Stower brings this action in his capacity as Foreign Representative, and not individually, under the standing granted to him by section 1509(b)(1) of the Bankruptcy Code.

16.    Plaintiff Jason Robinson is an individual residing in the Cayman Islands who has also been appointed by the Cayman Court as a Joint Official Liquidator of the Debtor in the Cayman Proceeding, and recognized by this Court as one of the Debtor's Foreign Representatives in this Chapter 15 Case. Mr. Robinson brings this action in his capacity as Foreign Representative, and not individually, under the standing granted to him by section 1509(b)(1) of the Bankruptcy Code.

17.    Defendant Cornide is an individual who, upon information and belief, has his main residence at 4635 Granada Blvd Coral Gables, FL 33146. At all relevant times Defendant Cornide was an Executive Director and one of the ultimate beneficial owners of the Debtor, and accordingly had a duty to refrain from any self-dealing, or at minimum an affirmative duty to disclose any such self-dealing, directly or indirectly, with the Debtor. Defendant Cornide is also sued in his capacity as the Trustee of the Falcon Family Trust.

18.    Defendant Falcon is an individual who, upon information and belief, has his main residence at 11301 SW 61 Ct, Pinecrest, FL. At all relevant times Falcon was an Executive Director and one of the ultimate beneficial owners of the Debtor, and accordingly had a duty to refrain from any self-dealing, or at minimum an affirmative duty to disclose any such self-dealing, directly or indirectly, with the Debtor. Defendant Falcon is also sued in his capacity as the Trustee of the Cornide Family Trust.

19.     Defendant Javier Jimenez a/k/a Javier Jimenez, Jr. is an individual who, upon information and belief, resides at 9827 NW 32nd Street, Doral, FL 33172. Jimenez is licensed as a certified public accountant (CPA) and as a real estate sales associate in the state of Florida. At various times Jimenez served in the capacity as Vice President of Finance and then CFO of the Debtor, and also was, acted as or held himself out to be the CFO of SBCP. Further, Jimenez has been and is the CFO of Beast Capital and Premier Assurance Group, LLC ("PAG LLC"), the Debtor's ultimate and immediate parent companies, and has held or holds similar positions in many other Defendant entities.

20.     Defendant Alos is an individual who, upon information and belief, resides at 4950 Riviera Drive, Coral Gables, FL 33146. He is an attorney and the owner of the law firm Alos & Associates PA in Coral Gables, Florida.

21.     Defendant Maria Sarduy is sued solely in her capacity as successor trustee of the Alos Family Trust.

22.     Silverback Capital Partners LLC ("SBCP") was a conduit entity organized in Florida with its principal address at 1901 Ponce de Leon Boulevard, Coral Gables, Florida, until it was administratively dissolved in September of 2021 for failing to file an annual report. At all relevant times, SBCP was owned and controlled by the Founder Defendants. Until at least April 9, 2018 Silverback Investments LLC (which is owned 50/50 by the Cornide and Falcon Family Trusts and managed by Cornide and Falcon) was the manager of SBCP; thereafter, Beast Capital was the manager of SBCP until its administrative dissolution effective September 24, 2021.

23.     Defendant Beast Capital is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd. #1107, Coral Gables, FL 33134. As of the date of the appointment of the Foreign Representatives in September 2020, Beast Capital was the ultimate parent of the

Debtor, and each of the Founder Defendants then owned a 50% beneficial interest in Beast Capital. Defendant Jimenez is, and at all relevant times was, the Manager of Beast Capital.

24. Defendant 117 Albatross (formerly known as 117 Silverback Investments LLC) is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd, Suite 1107, Coral Gables, FL 33134. Its former Manager was Defendant Cornide. Its current Manager is Defendant Falcon, and its registered agent is Bello & Martinez PLLC.

25. Defendant 301 Dale is an entity organized in Florida with its principal address at 814 Ponce de Leon Blvd., Suite 201, Coral Gables, FL 33134. Its current Manager is Macu Management LLC, of which Defendant Alos is the Manager and an Authorized Member. Its sole member is Defendant Alos. The registered agent is Joseph R. Gomez. The properties formerly acquired by 301 Dale with a portion of the SBCP Loan Proceeds are now owned by Defendant Alos.

26. Defendant 900 Dale is an entity organized in Florida with its principal address at 814 Ponce de Leon Blvd., Suite 201, Coral Gables, FL 33134. Its current Manager is Macu Management LLC, of which Defendant Alos is the Manager and an Authorized Member. Its sole member is Defendant Alos. The registered agent is Joseph R. Gomez, Esq. The property formerly acquired by 900 Dale with a portion of the SBCP Loan Proceeds is now owned by Defendant Alos.

27. Defendant 975 Dale is an entity organized in Florida with its principal address at 814 Ponce de Leon Blvd., Suite 201, Coral Gables, FL 33134. Its current Manager is Macu Management LLC, of which Defendant Alos is the Manager and an Authorized Member. Its sole member is Defendant Alos. The registered agent is Joseph R. Gomez, Esq. The property formerly acquired by 975 Dale with a portion of the SBCP Loan Proceeds is now owned by Defendant Alos.

28.     Defendant PBS is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Suite 1107, Coral Gables, FL 33134. Its Manager and CFO is Defendant Jimenez, and its registered agent is Registered Agents Inc.

29.     Defendant PAM is an entity registered in the British Virgin Islands with its address at 2020 Ponce de Leon Blvd., Suite 1107, Coral Gables, FL 33134. Defendant Falcon and Defendant Cornide are the two members. Defendant Jimenez is the CFO, and its registered agent in the British Virgin Islands is Bolder Corporate Services (BVI) Limited. Plaintiffs have been unable to determine whether Defendant PAM has a registered agent in the State of Florida.

30.     Defendant 45 SBH is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is SBH Re Holdings LLC, and its registered agent is Carlos A. Gil, P.A. Prior to April 11, 2022 Defendant Jimenez was its Manager. Its sole Member is the Cornide Family Trust.

31.     Defendant 1736 SBH (formerly known as 1736 Dale LLC) is an entity organized in Florida with its principal address at 2020 Ponce De Leon Blvd, Suite 1107, Coral Gables, FL 33134. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil. Its sole Member is the Cornide Family Trust. The property formerly acquired by 1736 SBH with a portion of the SBCP Loan Proceeds is now owned by Defendant Cornide.

32.     Defendant 2000 SBH (formerly known as 2000 Dale LLC) is an entity organized in Florida with its principal address at 2020 Ponce De Leon Blvd, Suite 1107, Coral Gables, FL 33134. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil. Its sole Member is the Cornide Family Trust. The property formerly acquired by 2000 SBH with a portion of the SBCP Loan Proceeds is now owned by Defendant Cornide.

33.     Defendant 2170 SBH (formerly known as 2170 Dale LLC) is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil. Its sole Member is the Cornide Family Trust. The property formerly acquired by 2170 SBH with a portion of the SBCP Loan Proceeds is now owned by Defendant Cornide.

34.     Defendant 74560 SBH is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil. Its sole Member is Defendant Cornide Family Trust.

35.     Defendant 248 SBI is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its former the Manager was Defendant Cornide, thereafter it was Defendant Jimenez. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil.

36.     Defendant 1901 SBI is an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. Its former Manager was Defendant Cornide. Its current Manager is Defendant Jimenez.

37.     Defendant 1919 SBI is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its former Manager was Silverback Investments LLC, and its registered agent was Defendant Cornide. Its current Manager is SBH RE Holdings LLC, and its registered agent is Carlos A. Gil. Upon information and belief this entity is owned at least in part by the Cornide Family Trust and the Falcon Family Trust.

38.     Defendant SBEP is an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is Defendant Cornide, and its registered agent is Bello & Martinez PLLC.

39.     Defendant Silverback Investments is an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is Defendant Jimenez, and its registered agent is Bello & Martinez PLLC.

40.     Defendant SMS is an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is Defendant Cornide, and its registered agent is Bello & Martinez PLLC.

41.     Defendant SBH Management Services is an entity organized in Florida with its principal address at 2020 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is SBH Re Holdings LLC, and its registered agent is Carlos A. Gil, P.A. Prior to April 11, 2022 Defendant Jimenez was its Manager.

42.     Defendant SB Midtown is an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. Its Manager is Defendant Cornide, and its registered agent is Bello & Martinez PLLC. Its Member is Defendant Cornide.

43.     Silverback Ventures LLC was an entity organized in Florida with its principal address at 1901 Ponce de Leon Blvd., Coral Gables, FL 33134. On September 27, 2019, Silverback Ventures was administratively dissolved for not filing an annual report. While active, its Manager was Defendant Cornide, and its registered agent is Bello & Martinez PLLC.

44.     At various times since their formation, and at all times relevant to their acquisition of the various properties with the SBCP Loan Proceeds, each of the Silverback Affiliates has been managed by an entity or entities under the ultimate ownership and control of the Founder Defendants, or in some instances by Defendant Jimenez acting under the direction and control and for the benefit of the Founder Defendants. A chart identifying the Manager and Authorized

14

Member of each Silverback Affiliate based on annual reports available through SunBiz is attached hereto as Exhibit B.

45.     Upon information and belief, the Doe Defendants are unnamed and unidentified persons and entities who may have conspired with, aided and abetted, and/or benefited from the wrongful acts and omissions of the Insider Defendants described in this action, and/or other similar transactions through and involving SBCP and the Silverback Affiliates that remain unknown to Plaintiffs at the present time.

**IV.**
**PROCEDURAL BACKGROUND**

46.     On September 21, 2020, the Foreign Representatives commenced the underlying Chapter 15 Case in which this adversary proceeding arises, by filing a Petition seeking, among other things, recognition of the Cayman Proceeding as a foreign main proceeding under Chapter 15 of the Bankruptcy Code, as well as various forms of relief including "entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the [F]oreign [R]epresentative(s)" under section 1521(a)(5) of the Bankruptcy Code.

47.     On November 17, 2020, this Court entered its recognition order [Chapter 15 Case ECF No. 45] (the "Recognition Order"). Among other things, the Recognition Order grants recognition to the Cayman Proceeding as a foreign main proceeding, and grants relief to the Foreign Representatives as requested. Specifically, the Recognition Order states that the Foreign Representatives "may operate the [D]ebtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552 of the Bankruptcy Code." Recognition Order ¶ 4(b).

48.     The Recognition Order entrusts the JOLs with the right to bring these causes of action on behalf of the Debtor as a form of additional relief under section 1521 of the Bankruptcy Code, entrusting the Foreign Representatives "with the administration and realization of all of the Debtor's assets within the territorial jurisdiction of the United States." Recognition Order ¶ 5(c). Pursuant to section 1509(b)(1), the Foreign Representatives have the capacity to sue and be sued in this Court.

49.     On April 21, 2021, the Foreign Representatives filed a Notice of Change of Status to reflect entry of an Order on April 19, 2021 by the Cayman Court, ordering that the Debtor be placed into official liquidation and wound up in accordance with the Cayman Islands Companies Act (the "Official Liquidation Order"). Among other things, the Official Liquidation Order appointed the Foreign Representatives as JOLs of the Company and, consistent with the prior orders of the Cayman Court, authorized them to secure or collect the assets of the Debtor.

50.     Accordingly, under the laws of both the Caymans Islands and the United States, the JOLs have the standing, right, power and duty to bring the claims and seek the relief set forth in this Complaint.

**V.
GENERAL FACTUAL ALLEGATIONS**

**A.     Corporate and Business Background of the Debtor**

51.     The Debtor is an exempted segregated portfolio company incorporated under the laws of the Cayman Islands on June 29, 2012. Until April 19, 2021, the date of the Official Liquidation Order entered in the Cayman Proceeding and of the appointment of the JOLs, the Debtor was regulated by CIMA, a regulatory body with jurisdiction over, and responsibility for, various regulatory functions. On April 22, 2021, a notice was issued by CIMA stating that the Company's Insurance License had been revoked effective as of April 19, 2021.

52.     The Debtor conducted its insurance business through two segregated portfolios, PASP and GASP. The principal activity of the Debtor's segregated portfolios was to insure events associated with human life. To this end, PASP offered unit-linked life insurance products,[1] and GASP offered health insurance products. GASP's products were offered globally with the exception of United States citizens and residents, and PASP's products were sold to markets in Latin American, the Caribbean (except the Cayman Islands), European and Asian regions. Thus, all of the plan participants in the PASP portfolio and policyholders of GASP portfolio are believed to have been residents of countries other than the United States.

53.     Neither the Debtor nor PASP employed any individuals. Rather, each acted through the Debtor's directors, officers and various agency, management or other relationships with affiliated entities owned and/or controlled by them, including but not limited to the Defendant PBS.

54.     The Debtor was founded by the Founder Defendants. Up until at least May 26, 2021, each of the Founder Defendants owned a 50% beneficial interest in the Debtor through his respective 50% ownership of the Debtor's ultimate parent, Beast Capital, which in turn wholly owned the Debtor's direct parent, PAG LLC.

55.     On or after May 26, 2021, the ownership structure of PAG LLC was altered. PAG LLC is owned in equal part by Paradigm Irrevocable Trust and Empyrean Irrevocable Trust of which the primary beneficiaries are the wives of the Founder Defendants. With these changes in PAG LLC's ownership, its management was changed. Its managers are now Defendant Jimenez and Simon Amich. Mr. Amich is the Debtor's former investment advisor, and was employed by

---

[1] Unit-linked life insurance products of the type offered by PASP combine insurance and investment benefits in a single plan, with the investment component tied to performance of the financial markets.

Premier Capital Advisors LLC ("PCA LLC"), an SEC registered advisor, CRD number 292761. Until at least May 26, 2021, PCA LLC was an affiliate of the Debtor by way of common ownership through the Founder Defendants. A chart showing the ownership and management of PAG LLC and Beast Capital as of September 20, 2020 is annexed as Exhibit C, and a chart showing the restructuring of these and related entities as of May 26, 2021 is annexed as Exhibit D.

56.      At all times relevant to the events, occurrences, transfers and transactions alleged in this Complaint, Defendant Cornide and Defendant Falcon were directors of the Debtor. Amb. Luis J. Lauredo and Alcides Isidoro Avila were appointed as directors effective September 28, 2018 and resigned effective February 23, 2021. Amb. Lauredo and Mr. Avila are not joined as Defendants at this time.

57.      In their capacities as directors, each of the Founder Defendants owed a fiduciary duty, among others, to avoid self-dealing with the Debtor. Consistent with that duty, the Founder Defendants were also required to disclose rather than conceal any such self-dealing to the Debtor's auditors and Cayman Islands regulatory authorities and the participants in the Debtor's PASP and GASP portfolios. The Founder Defendants owed a duty of loyalty to the Debtor, including the duty to assure that all corporate opportunities are preserved and pursued for the exclusive benefit of the Debtor and not usurped for their own personal benefit.

58.      Defendant Jimenez, CPA, was, or in the alternative held himself out to be, CFO of the Debtor, in which capacity he owed fiduciary duties to the Debtor. In addition, in his capacity as CFO, Defendant Jimenez was charged with knowledge of, and responsibility for, implementing reporting and disclosure requirements and internal controls as appropriate to an entity charged and entrusted with the investment of funds of its investor participants, and bears responsibility for the serious and unlawful financial irregularities described in this Complaint.

59.    Defendant Jimenez also holds a license from the State of Florida as a real estate associate, which license is placed with Dacor Realty, a Coral Gables-based real estate brokerage firm at which the licensed broker is Luis Cornide, the older brother of Defendant Cornide, who is not joined as a Defendant at this time. As both the CFO of the Debtor, Beast Capital and other affiliates, and a real estate sales agent at Dacor Realty, Defendant Jimenez was at all relevant times and is completely beholden to the Cornide family for his livelihood and professional career.

60.    On behalf of PASP, the Debtor received premium payments originating from plan participants into accounts maintained in the name of the Debtor at various financial institutions in the United States. These premiums were to have been invested in securities of a value sufficient to meet or exceed the total amount of payments expected to be made under the participants' unit-linked life insurance policies.

61.    Upon information and belief, until April 2018, the Debtor, on behalf of PASP, received investment advice from, and its investment reserves were managed by, an internal investment committee of which Defendants Jimenez and Falcon were members. After April 2018, a portion of the Debtor's investment reserves placed in capital markets were managed by PCA LLC, a separate legal entity beneficially owned by the Founder Defendants.

62.    The Founder Defendants and Defendant Jimenez also ultimately controlled Premier Trust, a trust established under the laws of the BVI pursuant to a Declaration of Trust dated 14 February 2006. Premier Trust was central to the contracting and issuance of the unit-linked life insurance products of the Company referable to PASP, and was the trust which purchased the unit-linked group life insurance policy issued by PASP.

63.    In certain marketing materials issued by Premier Trust, participants were sold that "Through our unit-linked products, participants can benefit from the most diverse global markets

as well as best-in-class custodians and asset managers in the industry," and that "The Company utilizes a diversified strategy to derive its principal protection. The investment instruments utilized include, but are not limited to, Structured Notes issued by A-Rated Institutions, Covered Call Strategies, ETF Hedged Covered Calls, and Enhanced Dividend Income Managed Accounts. Structured Notes are issued by Third Party Financial Institutions Rated A or higher by Standard & Poors, Moody's and/or Fitch." (Brochure annexed as Exhibit E**)**. Furthermore, certain enrollment agreements issued on Premier Trust letterhead confirmed to plan participants that "The Trustees shall direct the Insurance Company to invest the premium payments paid from each Sub-Fund in the investment funds specified by the relevant Plan Participant." **(**Application Form (redacted) annexed as Exhibit F**)**.

64.    Contrary to these representations to plan participants, the Founder Defendants and Defendant Jimenez advanced a significant portion of PASP's investment reserves to SBCP under the unsecured SBCP Notes which, as indicated, limited the Debtor at best to a capped interest rate return while the SBCP Loan Proceeds were diverted for their personal use and benefit as described in this Complaint.

65.    As a regulated insurance company in the Cayman Islands, the Debtor was required to seek approval from CIMA prior to making dividend payments to its shareholder. Consistent with that requirement, the Debtors own Dividend Policy noted that "Any and all dividends would comply with Cayman Islands law. It is also understood and agreed that the Company may not, without the written approval of the Cayman Islands Monetary Authority, distribute profits (including a dividend)." The SBCP Notes provided an avenue for the Founder Defendants to bypass this approval process and extract capital from the Debtor without regulatory oversight.

**B.    Corporate and Business Background of SBCP**

66.    SBCP was formed by the Founder Defendants on October 29, 2014, for what was stated to be the "express and singular purpose" of providing financial services such as commercial, residential and land loans collateralized by liens on real property under terms and conditions consistent with requirements set forth by SBCP.

67.    Together, the Founder Defendants own SBCP, and at all relevant times directly or indirectly owned and controlled the Debtor, SBCP and Beast Capital. Defendant Jimenez was the CFO of the Debtor and the Manager of Beast Capital, which succeeded Silverback Investments LLC as manager of SBCP in late 2018. At least one of the Founder Defendants directly or indirectly owns and/or controls each of the Silverback Affiliates, except for certain entities transferred to Defendant Also in connection with a settlement between him and Defendant Cornide.

**C.    The SBCP Notes**

68.    The illicit transactions by which the Insider Defendants siphoned funds away from the Debtor actually predate the execution of the earliest of the SBCP Notes. On December 4, 2013, the Founder Defendants as directors of the Debtor authorized the Debtor to transfer, as purported loans, a portion of investment reserves referable to PASP to Defendants Silverback Investments and Silverback Ventures "from time to time as requested." On January 1, 2014, the Founder Defendants caused 1901 SBI to execute and deliver a promissory note to the Debtor in the amount of $870,035.82 for the purchase of a "commercial office building located at 1901 Ponce de Leon Blvd., Coral Gables, Florida 33134." Additionally, on September 30, 2014, the Founder Defendants caused 1919 SBI to execute and deliver a promissory note to the Debtor in the amount of $630,000 for the purchase of a "commercial office building located at 1919 Ponce de Leon Blvd., Coral Gables, Florida 33134" for affiliated entities, including but not limited to SBCP.

During 2016 the loan balances outstanding and payable to PASP from Defendant Silverback Ventures, Defendant Silverback Investments, Defendant 1919 SBI and Defendant 1901 SBI were restructured and rolled up into the balance outstanding and payable to PASP from SBCP, under the SBCP Notes.

69.    Beginning in 2015, the Founder Defendants caused SBCP to execute and deliver promissory notes to the Debtor (i) dated February 12, 2015 (the "2015 SBCP Note") in the original principal amount of $10,000,000; (ii) dated December 31, 2016 in the original principal amount of $15,000,000 (the "2016 SBCP Note"); (iii) dated May 10, 2017 in the original principal amount of $20,000,000 (the "2017 SBCP Note") and (iv) dated August 10, 2020 in the original principal amounts of $10,000,000 (the "2020 SBCP Note") (collectively with the foregoing Notes, the "SBCP Notes").

70.    The 2015 and 2016 SBCP Notes were executed by Defendant Cornide, and the 2017 and 2020 SBCP Notes were executed by Defendant Falcon. Execution of the SBCP Notes as described above demonstrates that both of the Founder Defendants were actively involved in the and approved the advances of the SBCP Loan Proceeds from the Debtor to the conduit entity SBCP. Each of the Founder Defendants executed the subject Notes in his stated capacity as a Managing Member of SBCP, at a time when each also served as a director of the Debtor and accordingly owed fiduciary duties to the Debtor accordingly. True and correct copies of the SBCP Notes are attached to this Complaint as Composite Exhibit G.

71.    Under the cover of the SBCP Notes, and the prior transfers that were "rolled up" into those Notes, the Insider Defendants caused the Debtor, directly or indirectly through PAG LLC or Lyncpay, to advance a series of not less than 46 transfers to SBCP an aggregate amount

not less than $28,055,783.02 and potentially additional transfers for an even greater sum. All of these transfers were made by interstate bank wire or internet transfer.

72.     Among other things, the various SBCP Notes recited that SBCP "was formed for the singular and express purpose of financing high yielding securitized projects with low financial risk," and that each Note, *inter alia*, "will be paid down upon the sale of the underlying property described above." As alleged in greater detail below, the SBCP Loan Proceeds were not applied to projects of the types described, but rather were used for the ultimate benefit of the Founder Defendants. No "underlying property" is "described above" in those Notes, and the proceeds from sales of property by the Silverback Affiliates were seldom repaid to the Debtor under the SBCP Notes.

73.     The 2016 SBCP Note provides that it "replaces and supersedes" the 2015 Note, increases the ceiling on the purported SBCP Loan from $10 million to $15 million, and extends the maturity date from February 11, 2020 through December 31, 2022. The 2017 SBCP Note similarly states that it "replaces and supersedes" the 2016 Note, increased the purported borrowing limit to $20 million, maintained the previously extended maturity date as December 31, 2022, and contained an illusory provision for interest to accrue annually and to be paid "periodically at the sole discretion of [SBCP]." The 2020 SBCP Note purported to reduce the borrowing limit to $10 million.

74.     Even the interest rate caps set forth in the SBCP Notes were so illusory as to be meaningless. The 2015 SBCP Note provided for borrowing at an initial rate of "up to 3.00%." The 2017 SBCP Note carried forward the provision of the 2016 SBCP Note that interest was initially calculated at the rate of "up to" 4.0%, and adjusted sharply downward to the 90-day LIBOR rate plus 0.25% from December 31, 2018 until maturity. At all times these rates were significantly

lower than the rates at which the SBCP Loan Proceeds were "on loaned" to the Silverback Affiliates. As if to confirm the absence of any meaningful agreement to account or repay, the 2020 SBCP Note continued to contain the reference to LIBOR long after the announcement that LIBOR would be discontinued.

75.     In addition to the foregoing provisions for maturity and interest, the various SBCP Notes contain representations, warranties and agreements by SBCP as follows:

      a.    SBCP "was formed for the singular and express purpose of financing high yielding securitized projects with low financial risk";

      b.    the SBCP Notes are "secured by all Notes, jointly and severally, due and payable to Silverback Capital Partners LLC regardless of nature of the receivable";

      c.    "all Notes Receivable are collateralized by recorded mortgages on the underlying properties financed";

      d.    SBCP, or in the alternative Falcon, shall cause the SBCP Notes to "be paid down upon the sale of the underlying property" collateralizing a Note Receivable; and

      e.    the 2017 SBCP Note was to be "further secured by a guarantee from Mr. Leonardo L. Cornide and Mr. Jorge E. Falcon without limitations."

76.     Each of these statements was untrue, involved a fact or occurrence within the control of the Insider Defendants, and accordingly was known, or reasonably should have been known by the Insider Defendants in the proper exercise of their fiduciary duties to the Debtor, to have been untrue at the date of execution of each of the SBCP Notes, and remains untrue as of the date of this Complaint, because:

a.      The funds diverted from the Debtor's PASP portfolio to and through SBCP were not used to finance "high yielding securitized projects with low financial risk," but rather to engage in speculative real estate and securities ventures for the ultimate benefit of the Founder Defendants, Alos and the Family Trusts, while limiting the Debtor to a low rate of interest –lower than the rates applicable in the various notes issued by the Silverback Affiliates to SBCP in connection with the on-lending of the SBCP Loan proceeds – that is inconsistent with its sale to investors of participations in unit-linked life insurance investments;

b.      The obligations owed to the Debtor under the SBCP Note were never validly secured by the pledge or assignment of any note payable to SBCP, including by any of the Silverback Affiliates;

c.      No lien or security interest was ever created in favor of the Debtor on any of "the underlying properties financed," and to the extent that any "Notes Receivable (were) collateralized by recorded mortgages on" those properties, the mortgages were never validly assigned to the Debtor;

d.      Reflecting the risk associated with the absence of any valid or enforceable lien or security interest in the "underlying properties" or notes issued to SBCP by any of the Silverback Affiliates, SBCP did not, in many instances, cause the SBCP Notes to "be paid down upon the sale of the underlying property"; and

e.      The 2017 SBCP Note was never "further secured by a guarantee from Mr. Leonardo L. Cornide and Mr. Jorge E. Falcon without limitations," and the bogus provision for Founder Guarantees was dropped from the 2020 SBCP Note.

77.     In reality, there was no genuine intention to execute the Founder Guarantees, which were not taken seriously by Defendant Jimenez in his role as CFO nor referenced in the Debtor's audited financial statements for PASP covering each of the years from 2017 through 2019. Nevertheless, Defendants Cornide and Falcon provided false and misleading management representation letters to the Debtor's auditor that they had complied with all aspects of contractual agreements, such as the SBCP Notes.

78.     Reflecting the risk to which the Debtor was unreasonably exposed in this long-running series of self-dealing transactions without the grant of valid and perfected, legally enforceable liens and security interests in the underlying properties or notes issued by the Silverback Affiliates to SBCP, notes issued by certain of the Silverback Affiliates, including 45 SBH and 74560 SBH, have not been repaid to SBCP -- even though the underlying properties owned by those entities have been encumbered by mortgages in favor of Popular Bank, with the proceeds of the underlying loans unaccounted for by the Insider Defendants. Other "underlying properties" acquired with funds siphoned from the Debtor under the cover of the sham SBCP Notes have been sold at various times by various of the Silverback Affiliates, and in many instances the proceeds of those sales have not been applied to make payments to the Debtor under the SBCP Notes.

79.     Moreover, effective as of September 24, 2021, SBCP was administratively dissolved by the State of Florida for failure to file its required annual report, and its legal status is now shown as "Inactive." Consistent with that dissolution and status, it appears that SBCP has no cash accounts or deposits with banks, and is left only with whatever rights it may hold in respect of receivables owed from the Silverback Affiliates – none of which was ever the subject of a valid

and perfected, legally binding pledge or assignment to the Debtor, contrary to what was stated in the SBCP Notes that remain unpaid.

**D.**     **The Debtor's Misappropriated Funds Are Used For the Benefit of the Silverback Affiliates, the Family Trusts, Alos, and Ultimately the Founder Defendants, and Dissipated in Speculative Trading**

80.     Having misappropriated and directed the SBCP Loan Proceeds into SBCP via the artifice of the SBCP Notes, the Founder Defendants, aided and abetted by Defendant Jimenez and others, caused SBCP to deploy those funds for the benefit of the Silverback Affiliates, the Family Trusts, Alos, and ultimately the Founder Defendants, and dissipate them in speculative securities trading.

**1.**     **The Silverback Affiliates Amass a Real Estate Portfolio with the Debtor's Funds**

81.     No less than $25,998,417.36 of the SBCP Loan Proceeds were transferred from SBCP to the Silverback Affiliates in connection with a series of real estate transactions that took various forms but followed an overall pattern of fraudulent behavior by the Insider Defendants in their abuse of their positions in and control over the Debtor. Exhibit H hereto sets out the salient details of these real estate transactions (the "Silverback Affiliates Real Estate Transactions").

82.     The Silverback Affiliates Real Estate Transactions followed a pattern: funds were transferred directly or indirectly from the Debtor to SBCP and, usually simultaneously, by SBCP to a Silverback Affiliate, an entity (usually an LLC) that was owned directly or indirectly by one or both of the Founder Defendants, and occasionally in part by Defendant Alos, and created to hold the real estate that was purchased with the Debtor Funds. The Silverback Affiliate would sometimes – although not consistently – provide a purported promissory note in favor of SBCP and infrequently would purport to secure that note with a mortgage. Despite the clear language of

the SBCP Notes, however, these underlying notes and mortgages were never formally pledged or assigned to the Debtor.

83.    This pattern recurred no less than 49 times, through which not less than $25,998,417.36 of the Debtor's funds were used to build an extensive real estate portfolio. Separate and apart from other properties that already have been sold (generally at a significant profit for the ultimate benefit of the Founder Defendants and others), the value of the properties still owned by the Founder Defendants, directly and indirectly through the Silverback Affiliates and other entities, is believed to be not less than $24,749,700 according to publicly available information. In the aggregate, the value of the sold and unsold properties financed or acquired with the SBCP Loan Proceeds is believed to exceed $49,956,245.

84.    These facts alone reveal that the intent and effect of the Silverback Affiliates Real Estate Transactions was to misappropriate the Debtor's funds for the benefit of the Silverback Affiliates and the Founder Defendants who owned and/or controlled them, all the while limiting the Debtor at most to a fixed return at a negligible rate of interest and concealing this misappropriation from the Debtor's auditors, regulators, and, ultimately, insurance and investment plan participants. In this manner, the Founder Defendants managed for years to skirt regulatory restrictions on the payment of dividends from the Debtor.

85.    That intent and effect are evident from at least four other components of the Silverback Affiliates Real Estate Transactions. For one, the Founder Defendants caused a journal entry to be made on PASP's balance sheet falsely reflecting three pledges in favor of the Debtor to a purported capital contribution totaling $4.5 million. The effect of these pledges – which purported to constitute security interests in three parcels of real estate from the Silverback Affiliates Real Estate Transactions pursuant to incorporated mortgages – was illusory. Neither the

pledges nor the mortgages ever were recorded or otherwise perfected, and in 2016 the spurious journal entry was reversed.

86.    Second, certain of the promissory notes purportedly made by the Silverback Affiliates in favor of SBCP contain material misstatements of fact. The notes issued in connection with the 45 SBH Transaction and the 74560 SBH Transaction provide that the notes were issued "to support the company's advance to a marketing consultant contracted to expand sales efforts and objectives". In reality, the funds supported by the "notes" were used to purchase real estate for the benefit of the Cornide Family Trust and others as set forth above and, on information and belief, no marketing consultant was ever retained nor, in any event, was any marketing ever done by the Defendants.

87.    Third, the Silverback Affiliates Real Estate Transactions were conceived and carried out through a "heads we win, tails the Debtor loses" strategy inconsistent with and contrary to the representations in the SBCP Notes and making it evident that the Founder Defendants never intended to comply with the covenants in the SBCP Notes. Fourth, as a regulated insurance company that offered index participation products that carried a minimum guaranteed growth of funds invested by policyholders, the Debtor was expected to be prudent and diligent in the manner it invested its assets, so as to ensure the availability of sufficient assets to settle its insurance obligations including the guarantees provided to its policyholders. As at December 31, 2016, more than 24% of PASP's total assets had been advanced to SBCP under the SBCP Notes. This behavior directly contradicted the Debtor's Investment Policy dated December 15, 2016 which required a maximum allocation of 15% towards investment in "private equity." In response to a request from the Debtor, CIMA issued a directive on November 3, 2017 stating that CIMA "…considers the proposed allocation of investment in Private Equity of up to 25% of investment portfolio to be

29

aggressive and risky considering the nature of the long term business written through PASP and the provisions carried in its policy contracts, including guarantees and principal protection." As at December 31, 2017, more than 25% of total assets had been advanced to SBCP under the SBCP Notes.

### 2.      The Bouncing Ball of SBCP Loans

88.      As but one example, $2 million of the SBCP Loan Proceeds initially transferred from PASP to PAG LLC to SBCP and then to PBS – a Silverback Affiliate – in connection with a purported loan that was never documented between SBCP and PBS, was then transferred to PAM on or about December 28, 2016. PAM entered into a Promissory Note to SBCP, dated December 21, 2016, in connection with this transfer and purported to use the funds for a "marketing consultant contracted to expand sales efforts and objectives." This same $2 million finally came to rest with a major "producer" of investor participants, a Costa Rican national who still owes the Debtor not less than $1.3 million and potentially as much as $8 million.

### 3.      The Founder Defendants, Beast Capital and SMS Siphon the Debtor's Funds through SBCP

89.      No less than $8,682,251.17 of the Debtor's funds were transferred from SBCP to the Founder Defendants, Beast Capital, SMS and SBH MS LLC for no consideration or discernable purpose. Exhibit I hereto (the "Siphoned Funds Chart") alleges the pertinent details of these transfers. Upon information and belief, each of the transfers in the Siphoning Transfers was made by interstate bank wire.

### 4.      Realized Ill-Gotten Gains from the Purchase and Sale of Real Estate by Silverback Affiliates and Other Entities

90.      In addition to the existing portfolio of real estate described as Silverback Affiliates Real Estate Transactions, 27 real properties were purchased using the Debtor's funds or proceeds

thereof and sold prior to the commencement of this action. Exhibit J hereto sets forth the relevant

entities and the real properties (the "Realized Real Estate Transactions").

E.    **The SEC Orders and the Round Trip Transactions**

91.    On September 25, 2019 the SEC instituted and simultaneously settled

administrative and cease-and-desist proceedings against the Founder Defendants. pursuant to

Section 203(k) of the Investment Advisers Act of 1940, making Findings, and imposing a Cease-

and-Desist Order (the "Cease-and-Desist Order"). On January 24, 2020, the SEC issued an

Amended Order (the "Amended Cease-and-Desist Order," together with the Cease-and-Desist

Order, the "SEC Consent Orders"), in which the SEC found the Founder Defendants were using

investor funds to obtain personal loans and had failed to disclose their personal interests in the

transactions for which they used these funds. True and correct copies of the Cease-and-Desist

Order and the Amended Cease-and-Desist Order are attached to this Complaint as Exhibits K and

L, respectively.

92.    The Amended Cease and Desist Order states that:

a.    "[The Founder Defendants] advised [the Debtor] to invest up to 25% of its

investment reserves in a note with [SBCP], which was used to finance third-

party investments in Florida real estate. [SBCP] is owned and controlled by

[the Founder Defendants] and both individuals stood to profit from the note

with [the Debtor] because of the expected profits from [SBCP]'s real estate-

backed loans. ***Additionally, [SBCP] made personal loans to [Founder***

***Defendants] of over $6 million total in funds which [SBCP] borrowed***

***from [Debtor].***" (emphasis added).

b.    "[The Founder Defendants] own [SBCP], own [the Debtors'] holding

company, and are directors of [the Debtor] and had financial conflicts of

interest both with respect to [the Debtors'] investment in the note with [SBCP] and the personal loans. Since [the Founder Defendants] did not disclose these conflicts and get client consent to the conflicted transactions, [the Founder Defendants] violated Section 206(2) of the Advisers Act" (engaging in "a course of business which operates as a fraud or deceit on any client").

    c.    It was ordered that "Pursuant to Section 203(k) of the Advisers Act, [the Founder Defendants] cease and desist from committing or causing any violations and any future violations of Section 206(2) the Advisers Act."

    d.    It was also ordered that Cornide pay, in installments, disgorgement of $2,786,925 plus accrued interest $274,107.19, of which $655,350 has been previously paid, to the SEC, and that Falcon pay, in installments, disgorgement of $4,390,278 plus accrued interest $414,630.27, of which $920,349.82 has been previously paid, to the SEC. These amounts are those determined by the SEC to have been borrowed by Cornide and Falcon from SBCP and not repaid, plus applicable interest.

    e.    In addition, it was ordered that Cornide and Falcon each pay a civil penalty of $100,000.

93.    The principal purpose of the Amended Cease-and-Desist Order was to obtain for the Debtor the return of money unlawfully taken from it by the two defendants in the form of "personal loans" effected through SBCP. The SEC did so by establishing a Fair Fund, as provided under 27 CFR 201.1100, pursuant to which an arrangement can be made for disgorged funds to be returned to defrauded investors. The Amended Cease-and-Desist Order states that each of

Defendant Cornide and Falcon had paid disgorgement in the amount of $655,350 and $920,349.82, respectively prior to the date of the Amended Cease-and-Desist Order. The following payments were made from the Fair Fund to a bank account in the name of the Debtor:

       a.      $800,000 on April 7, 2020;

       b.      $1,300,000 on May 22, 2020;

       c.      $1,300,000 on August 4, 2020; and

       d.      $2,900,000 on November 4, 2020.

94.　　It was abundantly clear that the SEC Consent Orders required personal disgorgement by the Founder Defendants as a remedy for the fraud they had perpetrated on the Debtor under Section 262(2) of the Investment Advisers Act, and accordingly those Consent Orders specified that the fines and disgorgement payments were their personal obligations. Nevertheless, Plaintiffs have discovered that the payments that the Founder Defendants each made to the SEC, although represented to the SEC as coming from their own pockets, actually were made with funds embezzled from the Debtor. That is, having been caught in a fraud by enforcement authorities, the Founder Defendants brazenly used their control over the Debtor to commit another fraud on the very enforcement entity with which they had reached a settlement, and of course on the Debtor, which ended up receiving no money from the Founder Defendants as a result of their unfaithful and fraudulent abuse of their positions in and control over the Debtor.

95.　　Plaintiffs have determined that ***at least $5,300,000 of the funds paid to the Debtor from the SEC Fair Fund did not come from personal funds of the two Founder Defendants as required under the SEC Consent Orders, but rather from funds of the Debtor itself or funds that originated with the Debtor.*** These funds were taken by the Founder Defendants from various accounts owned by the Debtor or its portfolios, or SBCP and transferred, through machinations by

them, to their own accounts and thereafter to the Fair Fund, falsely representing these funds as their own. Thus, in purporting to satisfy their obligations under the SEC Consent Orders, the Founder Defendants *actually repaid the Debtor through the Fair Fund with the Debtor's own money, and in the process defrauded the U.S. Government as well as the Debtor*. The roundabout transactions through which certain of the payments by the defendants to the SEC were made are set out in Exhibit M hereto.

96.    Not satisfied with the mere deception of paying their legal obligations to the Debtor by "round-tripping" the Debtor's own funds, the Founder Defendants proceeded to "double dip" by deeming the round-tripped funds a payment of amounts owed to the Debtor under the SBCP Notes. The "double dip" scheme appears to have been engineered as follows:

- The loans identified by the SEC as loans from SBCP to the Founder Defendants remained unpaid in spite of the supposed compliance by the Founder Defendants with the SEC Consent Orders.

- These loans were then transferred from SBCP to the Debtor (specifically, its PASP portfolio) through a purported "reclassification."

- On December 31, 2019, $6,320,556.15 of the principal balance outstanding on the 2017 SBCP Note and accrued interest of $71,104.64 were reclassified in the Debtor's accounts from being recorded as due from SBCP to being due from the Founder Defendants.

- Upon information and belief, the transfer of this indebtedness, a receivable/asset of SBCP, was treated as a partial repayment to reduce the balance of the 2017 SBCP Note, as a result of which the 2020 SBCP Note reduced the principal amount from $20 million in the 2017 SBCP Note to $10 million.

- Thereafter, the Founder Defendants caused the Debtor to treat their fake payments through the Fair Fund as if they were real, thereby relieving themselves of their personal obligations to pay back to the Debtor at least $5.3 million of the $6.3 million that they unquestionably took from Debtor and/or SBCP.

97.     Through these manipulations of the books and records of the Debtor and SBCP, the Insider Defendants turned the SEC Consent Orders to the personal advantage of Falcon and Cornide, who double-dipped to eliminate both their personal obligations under the SEC Consent Orders and a similar amount of indebtedness owed by SBCP under the 2017 SBCP Note by round-tripping and double-accounting for the same funds they looted from the Debtor without ever personally making the disgorgement payments to the Fair Fund as required by those Orders.

98.     All of the foregoing transactions, transfers, schemes and manipulations, engineered by the Founder Defendants with the knowing assistance of Defendant Jimenez who as CFO had responsibility for the accuracy and integrity of the various financial books and records, are but further evidence to bolster the statements made by this Court at a hearing in the underlying Chapter 15 Case:

> [T]here is sufficient evidence within this [the Audrey Roe] affidavit and exhibit to show the previous SEC investigation and order uncovered that two of the directors, and we're talking now I believe about Cornide and Falcon, that two of the directors were effectively using [the Debtor] as a piggy bank and were loaning themselves money from its assets while serving as investment -- while serving as investment managers of PAG.

> The auditors also have strong evidence that a number of receivables on PAG's financial statements are now not recoverable and that this activity is the modus operandi of the directors, rather than a one-off event.

> Hearing Transcript from October 27, 2021, Case No. 20-20230-RAM at 67:21 - 68:8

[Chapter 15 Case ECF No. 139].

99.    During the same hearing Judge Mark also noted that "PAG's assets have already been diverted from [the Debtor] to questionable investments, including Silverback, and continue to invest in instruments that have serious recoverability concerns; and [], Jorge Eduardo Falcon and Leonardo Cornide are not fit and proper persons to hold the position of director of a licensee." *Id.* at 75:1-7.

### F.    It Only Gets Worse From There: SBCP's "SPECULATIVE" Securities Trading Losses

100.    Following entry of the SEC Consent Order and with the Round Trip Transactions in progress, and fully aware of having drawn the scrutiny of the SEC and CIMA, the Founder Defendants brazenly embarked on their most risky and speculative "investment" of the Debtor's funds to date: an all-or-nothing gamble in high-risk options.

101.    This foray into the world of options began sometime after December 31, 2019 when SBCP opened a brokerage account with Jefferies (the "Jefferies Brokerage Account"). By January 31, 2020, the Founder Defendants caused SBCP to transfer a net amount of $5 million from its bank account at City National Bank to the Jefferies Brokerage Account. These funds are traceable to monies that originated from the Debtor and were advanced under the SBCP Notes.

102.    As explicitly set forth in the account statements based on the Jefferies classification system, the stated investment objective of the Jefferies Brokerage Account was "**SPECULATION**" and the risk exposure was determined to be **"SPECULATIVE (AGGRESSIVE)."** Beginning in February 2020, and subsequent to entry of the SEC Consent Orders, SBCP engaged in extensive trading activity through the Jefferies Brokerage Account—primarily purchasing and selling exchange-traded options. These investments exposed SBCP and thus the Debtor to considerably higher risk than set forth in the SBCP Notes. Jeffries required account holders to sign a risk disclosure statement and acknowledgement relating to the risk profile

of these investments, which statement Defendant Jimenez signed on behalf of SBCP on January 15, 2020. SBCP's option trades proved to be a losing bet, ultimately out-of-the money, and as of February 28, 2021 SBCP had realized investment losses in the amount $4,916,611.16. **Simply put, even after entry into the SEC Consent Orders, the Founder Defendants gambled with approximately $5 million of the Debtor's investment reserves for their own personal gain through SBCP, and lost substantially all of it.**

103.    Trading in all-or-nothing options through the Jefferies Brokerage Account was not an investment or on-lending of proceeds from the SBCP Loan for "*securitized projects,*" of "*low financial risk,*" as provided in the SBCP Notes. Rather, it was a high-risk bet with the Debtor's investment reserves -- "**SPECULATION,**" as stated in the Jefferies Brokerage Account statements. Compounding the injury, had the Founder Defendants' bets through that Account cashed in, the SBCP Notes were structured so that the Debtor would receive only a fixed return at interest rates as low as 1.22% (while ultimately bearing the full risk of the loss,) and the Founder Defendants through their ownership and control of SBCP would reap the benefits.

104.    Stated in another fashion, what manner of fiduciary would "borrow" money from the entity to which he owed that fiduciary duty -- itself an investment vehicle for funds from innocent investors -- at a capped, low rate of interest, to engage in speculative, high-risk investment activity for his own ultimate financial benefit? The Founder Defendants did precisely that -- speculating with the Debtor's investment reserves for their own potential benefit, on what amounted to a risk-free basis because the Founder Guarantees to the Debtor as referenced in the 2017 SBCP Note never were executed and delivered to the Debtor.

105.    The Jefferies Brokerage Account was closed on or shortly before February 28, 2021. The balance of the funds in the account of $133,655.32 was transferred to an SBCP account

at Apollo Bank in Florida on February 2, 2021, and then onward to Beast Capital, which unlike

the Debtor remained under the control of the Founder Defendants and Jimenez. Overall, the trading

loss in the Jefferies Brokerage Account proved to be not less than $4.783 million.

**G.    Results of the Debtor's "Investment" in SBCP**

106.    As reflected in the Funds Flow Chart (Exhibit A), all or substantially all of the funds

described on the SBCP Transfers Chart (defined below and attached as Exhibit N) or Siphoned

Funds Chart (Exhibit I), or invested in the Jefferies Brokerage Account were funded directly or

indirectly to SBCP, often through PAG LLC and occasionally through Lyncpay, under the guise

of the SBCP Notes. The results of these transactions – all orchestrated by and for the ultimate

benefit of the Founder Defendants, Alos and the Family Trusts – speak for themselves: the

Silverback Affiliates grew an extensive real estate portfolio with the properties still owned worth

an estimated $24,749,700, and when realized ill-gotten gains are included, with an overall value

believed to exceed $49,956,425. In addition, the Founder Defendants, their alter ego Beast Capital

and other affiliate Defendants siphoned at least an additional $8,682,251.17, and the Founder

Defendants engineered the Round Trip Transactions that further diminished the Debtor's funds

and while purporting to satisfy their personal liabilities to the SEC Fair Fund and the Debtor.

107.    Despite the repeated references to a Collateral Package the SBCP Notes never were

secured by any pledge or assignment of notes or mortgages. Despite the reference in the 2017

SBCP Note, the Founder Guarantees were never executed and delivered, nor even taken seriously

by Defendant Jimenez who as CFO was charged with the obligation to protect the interests of the

Debtor in respect of both the Collateral Package and the Founder Guarantees. And as an emphatic

post-script to their years of active fraud and diversion of funds, the Insider Defendants continued

from September 2020—the month the Foreign Representatives were originally appointed as Joint

Controllers—to April 2021, to transfer funds from SBCP, leaving $0 balances in all of its accounts

that Plaintiffs have been able to locate. As a result of these deceitful, manipulative and criminal

acts, the Debtor has been left with no effective remedy to recover from SBCP the millions of

dollars that remain due and owing under the sham SBCP Notes.

108. Plaintiffs have engaged the law firms of Baker & McKenzie and Walkers to advise

and represent them in connection with the legal and equitable claims arising under the laws of the

United States, the State of Florida and the Cayman Islands from the foregoing acts and omissions

of all Defendants, and agreed to pay a reasonable fee for the services provided in the course of that

representation.

## VI.
## CLAIMS FOR RELIEF

### COUNT I
### VIOLATIONS OF FEDERAL RICO STATUTE, 18 U.S.C. § 1962(c)
(against the Insider Defendants)

109. The allegations of paragraphs 1 through 108 are incorporated and realleged herein.

110. 18 U.S.C. § 1962(c) provides that:

It shall be unlawful for any person employed by or associated with any enterprise engaged
in, or the activities of which affect, interstate or foreign commerce, to conduct or
participate, directly or indirectly, in the conduct of such enterprise's affairs through a
pattern of racketeering activity or collection of unlawful debt.

111. At all times of the activities referred to in this Complaint, SBCP was an enterprise

engaged in and whose activities affected interstate and foreign commerce in the manner described

more fully below. Through their ownership, control and management of SBCP following its

formation in 2014 and of the Debtor prior thereto and thereafter, the Founder Defendants – and

Defendant Jimenez, acting upon the instructions of the Founder Defendants in violation of his own

fiduciary duties and obligations as CFO of the Debtor and with full knowledge of the illegitimacy

of the subject transfers – conducted and participated in the conduct of the affairs of the enterprise

SBCP through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding the Debtor.

112.    Specifically, the Insider Defendants, using their positions of control, caused the Debtor to use a pattern of interstate wire transfers of funds from the Debtor's bank accounts that constitute property in the United States in an aggregate amount of more than $28,055,783.02, to SBCP for the ostensible purpose of supporting the funding by the Debtor of returns to participants in the Debtor's PASP portfolio.

113.    They did so through their control over the Debtors' assets, all or most all of which were, for the entire period of time in which the Debtor operated, in the United States, in the state of Florida. At all times material to the matters and events described herein, premium payments from plan participants located in foreign countries were transmitted to bank accounts in the United States, including but not limited to Bank of America, SunTrust and Valley National Bank. These payments were received through electronic transfers from policyholders and from banks and other credit card operators passing on payments from policyholders who paid by credit card.

114.    The Debtor's bank accounts in the State of Florida and elsewhere in the United States suffered extensive losses caused by the Insider Defendants as described herein.

115.    The Insider Defendants caused wire transfers to be made to SBCP, directly or indirectly from the Debtor's bank accounts, often through PAG LLC and sometimes through Lyncpay LLC, and then from bank accounts of SBCP in Florida at Wells Fargo, Jeffries, City National and Apollo. Many of these wire transfers, all of them in interstate commerce, are summarized in tabular format attached as Exhibit N (the "SBCP Transfers Chart").

116.    These fund transfers resulted in losses to the Debtor of a total amount to be determined at trial, while the Founder Defendants, their Family Trusts, and other Defendants,

including persons and entities to be identified realized substantial profits from their illicit self-dealing in amounts well in excess of the balance that may remain outstanding to the Debtor under the SBCP Notes.

117.    Notwithstanding their duty as officers and directors of the Debtor to disclose the full and accurate nature and extent of the subject transactions, the Insider Defendants fraudulently concealed their intention, on which they consistently thereafter acted, to deal with the SBCP funds as suited the personal financial interests of the Founder Defendants, by causing money to be transferred to the Founder Defendants, Beast Capital, or to the Silverback Affiliates for their ultimate use, benefit and profit. These acts of self-dealing and concealment were undertaken systematically as part of a pattern and practice spanning many years, in conscious and reckless disregard of their fiduciary obligations including the contractual obligations specifically undertaken in each of the SBCP Notes to utilize the amounts advanced under those Notes to make only secured high-yield, low-risk investments, and to provide the Founder Guarantees of repayment of any of the SBCP Notes.

118.    In addition, the funds provided to SBCP by the Debtor were to be repaid through the various measures provided for in the SBCP Notes for the purpose of securing repayment. The Insider Defendants caused SBCP to disregard and fail to enforce the implementation of these promised security measures undertaken by SBCP under the SBCP Notes. Instead, the Insider Defendants misappropriated the SBCP Loan Proceeds for the own personal use, benefit and profit of the Founder Defendants, at the expense and to the detriment of the Debtor.

119.    In so failing to comply with the terms of the SBCP Notes, the Insider Defendants continued, in violation of their duties to disclose, to act in disregard of the interests of the Debtor as suited their personal financial interests until certain of their activities came to the attention of

the U.S. Securities and Exchange Commission and CIMA. Because of the Founder Defendants' complete ownership and control of the Debtor and of SBCP, the Debtor had no capability to discover, or act in response to, injuries it incurred as a result of the fraudulent and undisclosed activities of the Insider Defendants as described herein. Thus, the Insider Defendants caused the Debtor to lose funds that they caused it to transfer to SBCP under the guise of the SBCP Notes while they benefited by using those funds to make payments to themselves and speculative investments for themselves, their business associates and their Family Trusts.

120.    Through their direction and control of both SBCP, an enterprise under §1962(2), and the Debtor, the Insider Defendants caused SBCP to engage in a pattern of related interstate wire transfers of funds obtained by them from the Debtor to various Silverback Affiliates owned or controlled by them. These transfers formed an extensive pattern, covering a period of at least seven years, continuing, upon information and belief, to the present day or, at least, for months after the appointment of the JOLs and the grant of relief to the JOLs as Foreign Representatives in the Chapter 15 Case.

121.    The subject transfers were related in that they were advanced as "loans" from the Debtor to SBCP under the guise of the fraudulent SBCP Notes, and further transferred by or through SBCP to the Silverback Affiliates and ultimately for the direct, indirect and ultimate benefit of the Founder Defendants for their own personal use, benefit and profit, including to satisfy their personal obligations owed to the Debtor under the SEC Consent Orders, and for the benefit of Alos, the Family Trusts, and persons and entities associated with Founder Defendants.

122.    The Insider Defendants, through their management and control of the enterprise SBCP, caused interstate wire transfers to be made in violation of federal law, which transfers had the direct effect of causing injury to property of the Debtor in the United States, including accounts

at Bank of America, Bank of New York, Deutsche Bank and Valley National Bank, from which funds were siphoned by the Insider Defendants from the Debtor, often through PAG LLC and Lyncpay LLC accounts at Wells Fargo, to and through SBCP. The Insider Defendants' activities undertaken and achieved through their control and operation of SBCP were carried out through numerous predicate violations of federal criminal law as described below

### PREDICATE VIOLATIONS
### Violations of Federal Criminal Wire Fraud (18 U.S.C. § 1343)

123.    The Insider Defendants, in their operation and control of SBCP, carried out an undisclosed scheme, including through the artifice of the SBCP Notes, to defraud the Debtor, through numerous violations of the federal criminal wire fraud statute, 18 U.S.C. § 1343, which makes it a crime for a person to devise or participate in a scheme to defraud and to make use of interstate wire transfers in so doing.

124.    As described above, and illustrated in the SBCP Transfers Chart and Siphoned Funds Chart (Exhibits N and I, respectively) the Insider Defendants' scheme to defraud the Debtor through SBCP for the personal benefit of the Founder Defendants, Alos and the Family Trusts involved the misappropriation of the opportunity to invest in Florida real estate, and outright embezzlement and other takings without legitimate basis or consideration., The Insider Defendants were able to implement their scheme because of their domination and control of the operations of the Debtor, including through their positions as officers and directors, in which they violated their obligations of trust and loyalty to the Debtor.

125.    Included among the real estate investments were seven investments made by Defendants Cornide and Alos through certain of the Silverback Affiliates formerly owned both of them. These investments later became the subject of a dispute between Cornide and Alos over the extent of claimed ownership, which led to a civil action in the Miami-Dade County Circuit Court

that ultimately was settled on undisclosed terms. Plaintiffs sought to assert their rights in and to the subject properties in the state court action but were precluded from doing so by the secret settlement, and now assert their rights against both of those Defendants and those properties by way of this adversary proceeding.

126.    All of the transactions and transfers within the scope of this Complaint were funded with money siphoned directly or indirectly from the Debtor -- often through other entities owned and controlled by the Founder Defendants such as PAG LLC -- under the guise of the SBCP Notes that bore interest rates as low as 1.22% with no fixed obligations for timing of interest payments and "floating" maturity dates for repayment of principal that were repeatedly extended through the successive SBCP Notes. In acting as they did, the Insider Defendants violated their fiduciary obligations of trust and loyalty and avoidance of conflicts of interest that they owed to the Debtor, and their legal obligations in respect of its stakeholders and participants, including insurance and investment plan participants, policyholders, auditors, and regulatory authorities in both the United States and the Cayman Islands.

127.    The Founder Defendants carried out the scheme by causing the Debtor to make interstate bank wire transfers of funds from the Debtor's bank accounts, including at Bank of America, Bank of New York and Valley National Bank in Florida, directly or indirectly to SBCP, the enterprise they created and controlled, and then from SBCP to themselves and other entities for purposes of carrying out their scheme, and to send emails in furtherance of and relating to these transfers and to the activities underlying them. The consequence of these activities was to cause extensive losses to the Debtor's PASP portfolio, which has been left in a condition of insolvency, while the Founder Defendants, Alos and the Family Trusts have realized and continue to reap the profits, gains and benefits of the investments made through the Silverback Affiliates.

128.    Certain of the transfers referred to in this Complaint and summarized in the SBCP Transfers and Siphoned Funds Charts were carried out by wire transfers through banks, and in accordance with banking practice, were made through the use of interstate wire facilities, including interbank transfers in Florida and New York through out-of-state clearing facilities such as those in New York and Atlanta.

129.    Accordingly, the activities of the Insider Defendants, as described in this Count and elsewhere in this Complaint, formed a pattern of numerous related violations of the criminal wire fraud statute, 18 U.S.C. §1343.

### Violations of Federal Bank Fraud Statute (18 U.S.C. §1344)

130.    The Debtor also was injured in its business and property by reason of violations of 18 U.S.C.§1964(c), through repeated predicate act violations by the Founder Defendants of the financial institution fraud statute, 18 U.S.C.§1344. On multiple occasions, the Insider Defendants caused transfers of funds to be made to Bank of America and Bank of New York Mellon into accounts established and maintained by the Founder Defendants for and/or in the name of the Debtor and/or PASP, and to cause transfers of funds to be made from that account, directly or indirectly, often through PAG LLC, to accounts at City National Bank and Wells Fargo established and maintained by them in the name of SBCP. See SBCP Transfers Chart.

131.    As reflected on the Funds Flow Chart, SBCP Transfers Chart and Siphoned Funds Chart, on multiple occasions the Founder Defendants caused transfers of SBCP Loan Proceeds to be made from the SBCP account to themselves and to the Silverback Affiliates, which where owned, controlled or allied with the Founder Defendants.

132.    All of these transfers were made pursuant to the above-described scheme to defraud the Debtor, and carried out through transfers from, to and through these bank accounts. As described throughout in this Complaint, the scheme to defraud consisted of the fraudulent

appropriation, or embezzlement by the Founder Defendants of funds of the Debtor in the bank accounts referred to above that had been entrusted to their care.

## Money Laundering (18 U.S.C. §1957)

133.    18 U.S.C. §1957 provides criminal penalties for a person who "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." 18 U.S.C. §1957(a). The Insider Defendants used SBCP to violate §1957, in that they knowingly engaged, as described in this Complaint and reflected in the SBCP Transfers Chart and Siphoned Fund Chart, in numerous transactions involving the interstate transfer of funds by wire in criminally derived property, each in an amount greater than $10,000, which were in fact proceeds of specific unlawful activity, to wit, wire fraud, bank fraud, interstate and foreign transportation in aid of racketeering enterprises and interstate and foreign transportation of stolen monies.

134.    The Insider Defendants also violated §1957 by engaging in numerous monetary transactions knowing that the funds involved in those transactions were criminally derived (having been obtained by fraud from the Debtor) of a value greater than $10,000, including those transfers of funds described on the SBCP Transfers Chart and Siphoned Funds Chart. The Insider Defendants knew that those funds were in fact proceeds of a "specified unlawful activity," defined in the money-laundering statutes as any of the violations of criminal law referred to in the RICO statute, 18 U.S.C. §1961, which include the violations of federal criminal law described herein.

## Interstate and Foreign Transportation In Aid of Racketeering Enterprises (18 U.S.C §1952)

135.    Among the numerous predicate acts committed by the Insider Defendants were violations of 18 U.S.C. §1952, which makes it a federal crime to use any facility in interstate or foreign commerce with the intent to distribute the proceeds of any unlawful activity. As described

throughout this Complaint and shown in the SBCP Transfers Chart and Siphoned Funds Chart, the Insider Defendants violated this provision by using facilities of interstate commerce in the form of bank wire transfers with the intent to distribute the proceeds of the unlawful activities of money laundering under 18 U.S.C. §1957, and to promote, manage, establish and carry on, and to facilitate, the promotion, management, establishment or carrying on, of this unlawful activity of money laundering in violation of the aforementioned statute. As described in this Count and elsewhere in this Complaint, these acts were undertaken and carried out through numerous wire transfer distributions of the SBCP Loan Proceeds -- proceeds of their illegal money laundering -- to themselves, Beast Capital, the Silverback Affiliates and others.. See SBCP Transfers Chart and Siphoned Funds Chart.

136.    These same acts also permitted, carried on and facilitated the promotion and carrying on of money laundering by effecting transfers to, from and through SBCP in the carrying out of the scheme or schemes to defraud.

### Interstate and Foreign Transportation of Stolen Monies (18 U.S.C. §2314)

137.    The Insider Defendants also committed numerous predicate acts in violation of 18 U.S.C. §2314, in that they transferred, in interstate commerce, as described above, through banks, money in the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud. These transfers to and from SBCP were effected pursuant to the scheme to defraud described in this Count and elsewhere in this Complaint. See SBCP Transfers Chart and Siphoned Funds Chart.

*        *        *

138.    As a direct and proximate result of the Insider Defendants' racketeering activities and violations of 18 U.S.C. §1962(c) through the predicate violations of federal criminal statutes as described above, the Debtor has been damaged in an amount to be proved at trial. In addition to

its actual damages sustained as a result of these unlawful and fraudulent activities, the Debtor is entitled to treble damages and an award of attorneys' fees and costs pursuant to 18 U.S.C. §1964(c).

## COUNT II
## CONSPIRACY TO VIOLATE FEDERAL RICO STATUTE, 18 U.S.C. §1962(d)
### (against the Insider Defendants)

139.    The allegations of paragraphs 1 through 138 are incorporated and realleged herein.

140.    As set forth above in Count I, the Insider Defendants agreed and conspired among themselves and other co-conspirators known and unknown to violate 18 U.S.C. §1962(d). In the course of and in furtherance of their conspiracy, the Insider Defendants conducted and participated in the conduct of the affairs of the enterprise SBCP through a pattern of racketeering activity as described in Count I above, including the predicate acts in violation of federal criminal law described in Count I above.

141.    The Insider Defendants knew or should have known that their predicate acts as described in Count I were part of a pattern of racketeering activity, and did agree with each other and with other unknown persons to the commission of those acts to further the scheme to defraud and to commit the violations of federal criminal law described in Count I above, and did commit overt acts in furtherance thereof. Their conduct constituted violations of 18 U.S.C. §1962(d).

142.    As a direct and proximate result of Insider Defendants' conspiracy, the Debtor has been damaged in an amount to be proved at trial. In addition, pursuant to 18 U.S.C. §1964(c), the Debtor is entitled to treble damages and an award of attorneys' fees and costs.

## COUNT III
## VIOLATION OF FLORIDA CIVIL RICO, Fla. Stat. § 772.103
### (against the Insider Defendants)

143.    The allegations of paragraphs 1 through 142 are incorporated and realleged herein.

144.    Beginning in or about 2014 and continuing after the appointment of Plaintiffs as Joint Controllers to the present day, the Insider Defendants, who were associated with the

enterprise SBCP through their ownership and/or control of that entity, engaged in an extensive pattern of activities that are and were subject to indictment as criminal offenses listed in 18 U.S.C. §1961(1) for violations of the provisions of federal criminal law described as having been committed by them in Counts I and II above. The proceeds of this criminal activity consisted of funds obtained by or for the ultimate use, benefit and profit of the Founder Defendants, directly or indirectly from the Debtor's bank accounts, through their operation of the scheme to defraud described above. The Insider Defendants used these proceeds in the establishment and operation of the enterprise SBCP, through which they engaged in the fraudulent activities described in Counts I and II.

145.    The pattern of criminal activity engaged in and conducted by the Insider Defendants through the enterprise SBCP of appropriating for the Founder Defendants and others funds provided by the Debtor to SBCP, and of investing in real estate and similar projects in the state of Florida controlled by them for their own benefit, had the same or similar intents, results and methods of using the Debtor's money that they caused the Debtor to provide to SBCP. Most of these criminal activities took place within five years of the Chapter 15 filing, after many other engagements in such criminal activity by the Founder Defendants.

146.    Through the pattern of criminal activity described throughout this Complaint, the Founder Defendants, acting with criminal intent, have directly and indirectly received the SBCP Loan Proceeds and invested those proceeds of their criminal activity to acquire and maintain interests in and control of real property located in the state of Florida, all in violation of section 772.103(1)-(3). In his capacity as Chief Financial Officer employed by and associated with Beast Capital and the Debtor, Defendant Jimenez has conspired with the Founder Defendants to violate

the foregoing statutory provisions and thereby committed unlawful acts under section 772.103(4), Fla. Stat.

147.    As a direct and proximate result of the Insider Defendants' criminal conduct in violation of §772.103, Fla. Stat., all of which occurred in or related to assets located in the state of Florida, the Debtor has been injured and sustained damages in an amount to be proved at trial. Further, the Debtor is entitled to treble damages and an award of attorneys' fees and costs pursuant to Fla. Stat. §772.104(1)

### COUNT IV
### BREACHES OF FIDUCIARY DUTY UNDER CAYMAN ISLANDS LAW
(against the Insider Defendants)

148.    The allegations of paragraphs 1 through 108 are incorporated and realleged herein.

149.    At all material times, each of the Founder Defendants in their capacity as directors of the Debtor, and Jimenez, who over a period of years served as Vice President of Finance and then CFO of the Debtor, owed fiduciary duties to the Debtor arising under and governed by the laws of the Cayman Islands, including, *inter alia*:

   a.    to act in good faith in the best interests of the Debtor;

   b.    to act for a proper purpose;

   c.    not to place themselves in a position where their personal interests or the interests of others might conflict with those of the Debtor; and

   d.    not to profit personally or receive unauthorized benefits from their positions from third parties or from the use of the Debtor's property.

150.    The Insider Defendants breached their fiduciary duties to the Debtor by orchestrating and undertaking the series of misappropriations and undisclosed self-dealing transactions under the cover of the SBCP Notes. In particular, and in direct violation of the duties identified immediately above, the Insider Defendants:

a.    failed to act in good faith in the best interests of the Debtor, and/or instead designed and implemented their illicit scheme to misappropriate the Debtor's assets to and for the ultimate personal investment, benefit and profit of the Founder Defendants, Alos and/or the Family Trusts, and the continued gainful employment and compensation of Defendant Jimenez;

b.    acted for the improper purposes of defrauding the Debtor, through a false and misleading structure that was inadequately documented to protect the interests of the Debtor in the proceeds of the SBCP Notes, and the profit the above-named Defendants illicitly derived therefrom;

c.    placed themselves repeatedly, with respect to each investment made under the guise of the SBCP Notes, in a position where the personal interests of the Founder Defendants as direct or indirect owners of the Silverback Affiliates, and the interests of others whom they sought to benefit through the profits they sought to make and did make in those investments, would conflict with those of the Debtor that was left with, at best, a return at a low rate of interest while bearing the risk of non-payment on unsecured obligations while the Founder Defendants reaped the profits and other benefits of the investments;

d.    directly and indirectly profited and received unauthorized (and undisclosed) benefits from their positions through the use, misuse, misappropriation and investment of the Debtor's property funnelled to and through SBCP under the guise of the SBCP Notes. These acts of misappropriation, non-disclosure, self-dealing and personal enrichment at the expense of the

51

Debtor through the SBCP Loans and securities investments through the Jefferies brokerage account, violated the fiduciary duties owed by officers and directors of a Cayman Islands company under the laws of the Cayman Islands.

151.    Further or alternatively, Defendant Jimenez failed to exercise independent judgment and/or fettered his discretion and/or failed to act in the best interests of the Debtor by acting on the instructions of the Founder Defendants and for their personal benefit in directing and/or implementing the dozens if not hundreds of direct and indirect transfers, often through PAG LLC, to and through SBCP, which transfers looted the Debtor, in breach of his fiduciary duties owed as its CFO.

152.    The Debtor has suffered damages as a result of those breaches, which caused the Debtor to be deprived of the assets that were diverted from it under the cover of the SBCP Notes, and the profits derived from the investment of the Debtor's assets in the Florida real estate interests acquired for the financial benefit of the Founder Defendants and others.

153.    As a result of the breaches set out above, the Debtor has suffered loss and damage, for which the Insider Defendants are liable to pay damages or equitable compensation in an amount to be proved at trial. Further or alternatively, the Insider Defendants are liable to account to the Debtor for any profits made from their breaches of fiduciary duty. Further or alternatively, any funds or property received and retained by the Founder Defendants in breach of fiduciary duty and/or the traceable proceeds of the same and/or any profits thereon and/or profits made by them as a result of such breaches, are held on constructive trust for the Debtor. Further or alternatively, the Debtor seeks an order for further or other relief (including all necessary accounts and inquiries

to determine the amount of any damages and/or profits payable by the Insider Defendants to the Debtor).

## COUNT V
## UNLAWFUL MEANS CONSPIRACY UNDER CAYMAN ISLANDS LAW
### (against the Insider Defendants )

154.    The allegations of paragraphs 1 through153 are incorporated and re-alleged herein.

155.    As described in the preceding Counts of this Complaint, the Insider Defendants acted in breach of their fiduciary duties owed to the Debtor, and the Insider Defendants, wrongfully and with an intent to defraud and injure the Debtor by unlawful means, conspired and combined together to perform a series of overt acts and/or to defraud the Debtor.

156.    This conspiracy involved and took the form of:

a.    a combination, understanding, agreement and/or concert to injure the Debtor between and among the Insider Defendants, knowingly and willfully to devise, effectuate and implement, through their positions of control and fiduciary responsibility to the Debtor, the fraudulent and illicit scheme pursuant to which tens of millions of dollars invested and maintained in the Debtor's PASP portfolio were diverted, under the cover of the SBCP Notes bearing low rates of interest, to the Silverback Affiliates at higher rates, for investment in high-risk, high-profit real estate assets, and/or direct or indirect transfers to or for the benefit of the Founder Defendants, Alos and/or the Family Trusts, and/or in breach of fiduciary duty as set out in Count V below;

b.    further, as a certified public accountant licensed in the State of Florida, Defendant Jimenez is charged with knowledge of general accounting principles, internal controls and limits on self-dealing, and held to the

standard of a reasonable and knowledgeable financial professional in respect of his dealings with the Debtor and third parties in his capacity as the Debtor's CFO. Defendant Jimenez knowingly and willfully effectuated or directed others to effectuate the series of transfers from the Debtor to and through SCBP to the Silverback Affiliates, Beast Capital and the Founder Defendants and other entities under the cover of the SBCP Notes, in furtherance of the conspiracy as alleged herein;

c.      with the intent to cause injury to the Debtor for the personal benefit of the Founder Defendants, Alos and/or the Family Trusts, by exposing the Debtor to the risk of a failed investment and limiting its benefit to the low interest rate set forth in the SBCP Notes that contained no effective payment, default, acceleration or other enforcement mechanisms and, contrary to their terms, at all relevant times were wholly unsecured; and

d.      caused loss and damage to the Debtor, which was rendered insolvent while the Founder Defendants, Alos and/or the Family Trusts all profited and continue to profit from the fruits of this unlawful and injurious conspiracy.

e.      throughout, the Insider Defendants have concealed and continue to conceal the matters set out above and the whereabouts of the proceeds of their fraud from the Debtor.

157.    Pursuant to and in furtherance of the conspiracy, the Insider Defendants carried out and otherwise participated in a series of unlawful acts and in breach of their fiduciary duties as set forth in this Complaint, by which the Debtor was injured. In doing so, the Insider Defendants acted

dishonestly and/or in the knowledge that such acts had been carried out in breach of their fiduciary duties.

158.    As a direct and proximate result of the aforementioned matters, the Debtor has suffered loss and damage, including (but not limited to) loss of profits in an amount to be determined by the Court.

159.    By reasons of the conspiracy to defraud and injure the Debtor, in accordance with the laws of the Cayman Islands, the Insider Defendants are jointly and severally liable to the Debtor in damages for conspiracy in a sum to be determined by the Court.

**COUNT VI**
**KNOWING RECEIPT AND/OR EQUITABLE PROPRIETARY CLAIMS UNDER**
**CAYMAN ISLANDS LAW**
(Against the Founder Defendants, Beast Capital, Silverback Affiliates, and Falcon and Cornide Family Trusts)

160.    The allegations of paragraphs 1 through 108 and 148 through 159 are incorporated and realleged herein.

161.    As set forth in the preceding Count of this Complaint, each of the Insider Defendants acted in breach of his fiduciary duties owed to the Debtor. Further or alternatively, as directors of the Debtor, the Insider Defendants were trustees of the Debtor's funds, assets and property under their possession and control.

162.    The Founder Defendants, Beast Capital, the Silverback Affiliates and the Cornide and Falcon Family Trusts are liable under the applicable and governing laws of the Cayman Islands for knowing receipt of the sums described elsewhere in this Complaint and shown in the SBCP Transfers Chart and Siphoned Funds Chart. Specifically:

  a.    through the artifice and device of the SBCP Notes, the Founder Defendants and/or Defendant Jimenez caused the disposition of the Debtor's funds in

55

breach of trust and/or fiduciary duty, see SBCP Transfers Chart and Siphoned Funds Chart;

b.    the aforesaid funds were trust property on the basis that they belonged to the Debtor as described herein and/or had been obtained in breach of trust and/or fiduciary duty;

c.    the Founder Defendants, Beast Capital, the Silverback Affiliates and the Falcon and Cornide Family Trusts beneficially received the aforesaid funds in an amount believed to be in excess of $34,680,668.53 which are traceable to a breach of trust and/or fiduciary duty and/or as having been advanced by the Debtor to SBCP under the guise of the SBCP Notes; and

d.    each of the foregoing Defendants received the aforesaid sums with knowledge that such funds were trust property and/or had been obtained in breach of fiduciary duty. At all material times, the Founder Defendants (i) were directors of the Debtor; (ii) had ultimate beneficial ownership and/or control of the Debtor; and (iii) had ultimate beneficial ownership and/or control of SBCP, Beast Capital and the Silverback Affiliates and in their capacity as trustees of the Falcon and Cornide Family Trusts. At all material times, Defendant Jimenez was CFO of the Debtor, SBCP Beast Capital and some or all of the Silverback Affiliates. Further, Plaintiffs aver that any knowledge of the Insider Defendants in their capacity as officers and/or trustee and/or the directing mind of the Silverback Affiliates, Beast Capital and the Family Trusts (as applicable) will be attributed to such entities and/or trusts. Accordingly, at all material times, each of the foregoing

56

Defendants knew that the sums so received and utilized for their direct and indirect personal benefit were traceable to the Founder Defendants' and/or Defendant Jimenez's breaches of fiduciary duty as alleged above and/or for their benefit and to the detriment of the Debtor. In the circumstances, it is unconscionable for the said Defendants to retain the benefit of the receipt of such trust property and/or its traceable proceeds.

163.    As a result of their knowing receipt of the SBCP Loan Proceeds and other diversions from the Debtor as described in this Complaint, each of the Founder Defendants, Beast Capital, the Silverback Affiliates and the Cornide and Falcon Family Trusts is liable to the Debtor to restore or make good the value of the property received and to account for any profit made from the assets received.

164.    Further or alternatively, Plaintiffs hold and assert proprietary rights under Cayman Islands law in any and all of the aforesaid trust property of the Debtor and/or any identifiable substitute for such trust property which has been retained by the said Defendants (including but not limited to any profits derived from the sale or transfer of any interest in any such property, or other gains or benefits arising from the ownership of such property). Plaintiffs are entitled to trace the sums referred to in paragraph 162(a) and (c) above into and claim equitable title to such sums, which each of the Defendants hold on trust for the Debtor.

## COUNT VII
## DISHONEST ASSISTANCE UNDER CAYMAN ISLANDS LAW
(against Defendant Jimenez)

165.    The allegations of paragraphs 1 through 108 and 148 through 164 are incorporated and realleged herein.

166.    As set out in the preceding Counts of this Complaint, the Founder Defendants acted in breach of their fiduciary duties owed to the Debtor. Further or alternatively, as directors of the

Debtor, the Founder Defendants were trustees of such funds of the Debtor's assets and property as were in their possession and control.

167.    As set out in the abovementioned paragraphs of this Complaint, Defendant Jimenez acted dishonestly in aiding, assisting, furthering and/or procuring the abovementioned breaches of fiduciary duty by the Founder Defendants to the Debtor, through the following acts and omissions:

      a.    In his role as CFO of the Debtor, SBCP Beast Capital and some or all of the Silverback Affiliates, Defendant Jimenez had overall responsibility for the financial affairs of the Debtor and those affiliates.

      b.    In particular, Defendant Jimenez, *inter alia*, knew of, approved and/or directed dozens and dozens transfers of funds from the Debtor to and through SBCP and the Silverback Affiliates under the cover of the sham SBCP Notes, maintained the books and records of the Debtor that reflected those transfers, and signed financial statements and other records and reports that knowingly misrepresented the state of financial affairs between and among those entities.

      c.    Further or alternatively, through the sham and artifice of the SBCP Notes as alleged in this Complaint, Defendant Jimenez otherwise carried out acts on behalf of the Debtor upon the instructions of the Founder Defendants, in aid, assistance and furtherance of the breaches of such duties owed by the Founder Defendants.

168.    Defendant Jimenez acted dishonestly in assisting the Founder Defendants in relation to each of their breaches of fiduciary duty. In particular (*inter alia*):

a.      As a certified public accountant licensed in the State of Florida, Defendant Jimenez is charged with knowledge of general accounting principles, internal controls and limits on self-dealing, and held to the standard of a reasonable and knowledgeable financial professional in respect of his dealings with the Debtor and third parties in his capacity as the Debtor's CFO.

b.      Defendant Jimenez had knowledge of the illegitimacy and illegality of the subject transfers undertaken under the cover of the SBCP Notes. Further, Defendant Jimenez knowingly and willfully effectuated and carried out the aforesaid transfers without regard to their significant negative financial impact on the Debtor.

c.      As set out in paragraph 76 of this Complaint, Defendant Jimenez knew, or in the exercise of reasonable due diligence and professional judgment had reason to know in his role as Vice President Finance or CFO of the Debtor, that the representations, warranties and agreements by SBCP in the SBCP Notes as set out in paragraph 75 of this Complaint were untrue and/or had not been complied with, and/or otherwise were not in the best interests of the Debtor. Further, as Defendant Jimenez well knew or had reason to know in the exercise of such reasonable due diligence and judgment, there was no legitimate commercial or other reason for the Debtor to advance tens of millions of dollars under the unenforceable SBCP Notes to or for the personal benefit of the Founder Defendants, Alos and the Family Trusts, at considerable risk and no meaningful commercial benefit to the Debtor.

    d.    Defendant Jimenez's knowledge above was such as to render his participation in the transactions contrary to normally acceptable standards of honest conduct.

169.    In the circumstances, Defendant Jimenez provided dishonest assistance to the aforesaid breaches of fiduciary duties by the Founder Defendants for which he is liable to the Debtor under the laws of the Cayman Islands. Plaintiffs seek and are entitled to a declaration that Defendant Jimenez is liable to account to the Debtor for in an amount to be determined by the Court or such other sum as the Court thinks fit as a constructive trustee on the ground of his dishonest assistance in each of the Founder Defendant's breaches of fiduciary duty; and an order that the Defendant pay to the Debtor such sums.

170.    As a result of the matters set out above, the Debtor has suffered loss and damage resulting from the aforesaid breaches of fiduciary duty which have been dishonestly assisted by Defendant Jimenez, in an amount to be determined by the Court in accordance with the laws of the Cayman Islands.

171.    In the circumstances, Defendant Jimenez is liable in equity to make good any loss which the Debtor has suffered as a result of the multiple breaches of trust and/or fiduciary duty in which he actively participated and which he dishonestly assisted or procured.

## COUNT VIII
## <u>USURPATION OF CORPORATE OPPORTUNITY UNDER FLORIDA LAW</u>
(against the Founder Defendants)

172.    The allegations of paragraphs 1 through 108 are incorporated and re-alleged herein.

173.    At all times relevant to this Complaint, the Founder Defendants held, maintained and exercised dominion and control over the actions and affairs of the Debtor through the combination of their ultimate equity holdings, their executive positions and domination of the Debtor's board of directors through those holdings and positions.

174.    Starting in or about 2014, acting within the state of Florida and taking advantage of their dominant and controlling positions over the Debtor, the Founder Defendant have taken steps to cause the Debtor to allocate a portion of its investment funds to investments other than in listed securities, and instead to apply such funds to the acquisition of commercial and residential real estate located in the state of Florida, where the funds of the Debtor were maintained and the Founder Defendants have lived and worked at all times relevant to the acts and omissions alleged herein.

175.    Both the opportunity to invest in Florida real estate and the funds used to make those investments were assets of the Debtor located within the state of Florida. Those funds could have been used, and the investment opportunity pursued and benefits achieved, for the direct or indirect benefit of the Debtor and not for that of the Founder Defendants, Silverback Affiliates and the other Defendants identified in this Complaint. Instead, the Founder Defendants took wrongful advantage of their control and domination of the Debtor to arrange for and cause the funds of the Debtor to be transferred to SBCP, a company owned and controlled by them, and then to be on-loaned to the Silverback Affiliates for the real estate investments or other purposes for the benefit of the Founder Defendants.

176.    The Founder Defendants caused the Debtor, in particular PASP, to transfer the funds to SBCP through loans at low interest rates, and as contemplated in the SBCP Notes, then caused SBCP to transfer SBCP Loan Proceeds to the Silverback Affiliates and other entities owned and/or controlled by them to finance the purchase of real properties in Florida, as described in greater detail elsewhere in this Complaint and shown in the SBCP Transfers Chart. At each and every stage of this these real estate investment transactions the Founder Defendants personally profited through their ultimate ownership and control of each affected entity: the significantly

higher interest rates at which the SBCP Loan Proceeds were "on-loaned" to the Silverback Affiliates; the investment of those Loan Proceeds in Florida real estate that was expected to appreciate, and in most cases did appreciate, in value; the retention of those profits for the Silverback Affiliates upon sale or refinancing of the properties; the failure in many instances to ensure that any repayments made by the Silverback Affiliates to SBCP were in turn passed through and repaid to the Debtor in respect of obligations that were to have been secured by the Collateral Package but never were so secured.

177.    The manner in which the Founder Defendants caused the Debtor to funnel in excess of $28,055,783.02 to SBCP and the SBCP Affiliates to finance the Florida real estate transactions under the guise of the SBCP Notes was not in the interest of the Debtor, but in the self-interest of the Founder Defendants for their own ultimate financial benefit, in the form of the appreciation, profits and liquidity created by refinancing of the properties acquired through their fraudulent scheme.

178.    The SBCP Loan Proceeds misappropriated from the Debtor and the properties acquired through the investment of those Proceeds were obtained by and for the benefit of the Founder Defendants as a result of their usurpation from the Debtor of the corporate opportunity of investing in Florida real estate.

179.    Accordingly, the Plaintiffs seek damages in an amount to be determined by the Court, disgorgement by the Founder Defendants of all profits and benefits obtained by them through the real estate investments acquired with funds of or derived from the Debtor, and punitive damages in accordance with governing law.

**COUNT IX**
**CIVIL THEFT UNDER SECTION 772.11, FLA. STAT.**
(against the Founder Defendants)

180.    The allegations of paragraphs 1 through 108 are incorporated and realleged herein.

181.    Over a period of at least seven years as described throughout this Complaint and reflected on the SBCP Transfers Chart and, the Insider Defendants caused the Debtor to funnel tens of millions of dollars directly and indirectly to SBCP under the false cover of the sham SBCP Notes. These transfers were made with the felonious intent of appropriating (i) a portion of the SBCP Loan Proceeds directly to the Founder Defendants and Beast Capital as shown on the Siphoned Funds Chart, and (ii) the remaining SBCP Loan Proceeds to and through SBCP as shown on the SBCP Transfers Chart, for the ultimate use and benefit of the Founder Defendants, Beast Capital, the Silverback Affiliates, the Family Trusts and Alos, none of whom were entitled to such use.

182.    The SBCP Loan Proceeds also were diverted as described with the felonious intent of depriving the Debtor of both those Proceeds and the profits and gains derived from the real estate empire and other contemplated investments, leaving the Debtor with at best a capped low rate of interest while the Defendants retained the gains and profits.

183.    The Debtor was injured by the unlawful transfers of the SBCP Loan Proceeds. On October 7, 2021, the Foreign Representatives notified the Founder Defendants of their intent to assert civil theft claims against them, and provided them with a 30-day period to repay a portion of the SBCP Loan Proceeds.. The Foreign Representatives have received no response to this demand letter, a true and correct copy of which is attached as Exhibit O to this Complaint.

184.    As a direct and proximate result of the Founder Defendants' civil theft, the Debtor has suffered damages in an amount to be proved at trial. Further, pursuant to Fla. Stat. §772.11(1), the Debtor is entitled to treble damages and an award of reasonable attorneys' fees and costs.

**COUNT X**
**CONVERSION UNDER FLORIDA LAW**
(against Founder Defendants, Beast Capital, Silverback Affiliates and Falcon and Cornide Family Trusts)

185.    The allegations of paragraphs 1 through 108 are incorporated and realleged herein.

186.    As the ultimate owners in control of SBCP, Beast Capital and the Silverback Affiliates, the Founder Defendants knowingly exercised wrongful dominion over the SBCP Loan Proceeds, and converted those Proceeds to their own use, and that of the other Defendants named in this Count, as part of the scheme to defraud, to the detriment of the Debtor. In such manner, the Founder Defendants and Beast Capital exercised wrongful dominion over the SBCP Loan Proceeds, including the amounts invested in high-risk securities trading at Jefferies.

187.    The Founder Defendants and Beast Capital utilized SBCP for their own personal benefit and gain, to divert the SBCP Loan Proceeds from the Debtor under false pretenses, false representations and actual fraud, thereby engaging in fraud and/or defalcation while acting in a fiduciary capacity, as well as embezzlement or other larceny against the Debtor.

188.    Beast Capital and the Silverback Affiliates, through the Founder Defendants, have engaged in and received unauthorized transfers of assets, depriving the Debtor of its property over an extensive period of time. Through their acts of self-dealing as effectuated personally and through Beast Capital and the Silverback Affiliates, the Founder Defendants knowingly exercised wrongful dominion over the SBCP Loan Proceeds diverted from the Debtor under the cover of the SBCP Notes.

189.    The transfers to which this Count for Conversion are directed are those described in the SBCP Transfers Chart and Siphoned Funds Chart, which attached to this Complaint as Exhibits N and I, respectively).

190.    As a direct and proximate result of the Defendants' acts of conversion, the Debtor has been damaged in an amount to be proved at trial, including but not limited to punitive damages.

### COUNT XI
### <u>CONSTRUCTIVE FRAUD UNDER FLORIDA LAW</u>
(against the Insider Defendants)

191.    The allegations of paragraphs 1 through 108 are incorporated and realleged herein.

192.    At all times relevant to the facts and occurrences set forth in this Complaint, here existed a confidential and/or fiduciary relationship between the Insider Defendants and the Debtor.

193.    Through their confidential and/or fiduciary relationship to the Debtor and in violation of their duty to avoid improper self-dealing and fully disclose any insider transactions with the Debtor, the Insider Defendants took unconscionable advantage of the positions of trust to abuse the relationship and wrongfully benefit and enrich the Founder Defendants, Alos and the Family Trusts by, among other things, making unlawful use of the SBCP Loan Proceeds. The Insider Defendants had actual conflicts of interest with respect to the SBCP Notes and the subsequent loans to the Silverback Affiliates, and most glaringly to the diversion of a portion of the SBCP Loan Proceeds to or for the ultimate benefit of the Founder Defendants and the Family Trusts.

194.    Through their ownership and control of the Debtor, SBCP and the Silverback Affiliates, the Founder Defendants caused money to be transferred to SBCP and thereafter to the Founder Defendants in their personal capacity, to Beast Capital and/or the Silverback Affiliates or other Defendants, including Defendant entities that the Founder Defendants controlled, or the Family Trusts settled for the benefit of their family members, and thus used the proceeds for the benefit of themselves.

195.    The Insider Defendants' actions caused the Debtor to be deprived of the SBCP Loan Proceeds and the gains and profits derived therefrom, and as a proximate result the Debtor has suffered financial loss.

196.    As a result of these unlawful acts, the Debtor is entitled to restitution and disgorgement of all gains and profits, in an amount to be proved at trial, and other equitable relief as the Court deems just and proper.

## COUNT XII
## UNJUST ENRICHMENT UNDER FLORIDA LAW
(against Founder Defendants, Beast Capital, Silverback Affiliates, Alos and Family Trusts)

197.    The allegations of paragraphs 1 through 108 and 180 through 196 are incorporated and realleged herein.

198.    As a result of the misconduct of the Insider Defendants and others as described throughout this Complaint, each of the Defendants in this Count (collectively, the "Unjust Enrichment Defendants") has been enriched at the expense of the Debtor, specifically its PASP portfolio.

199.    The Unjust Enrichment Defendants have been enriched directly and indirectly by transfers of millions of dollars of SBCP Loan Proceeds as reflected on the SBCP Transfers Chart and Siphoned Funds Chart, and the gains and profits derived from the sale, refinancing and/or appreciation in value of the real estate and other investments acquired with the SBCP Loan Proceeds.

200.    Each of the Insider Defendants had a close relationship with the Debtor, SBCP, Beast Capital and the Silverback Affiliates, and actively participated and played an important role in the orchestration, planning, perpetration, and or execution of the scheme to defraud the Debtor. Each of the Unjust Enrichment Defendants was aware, or through the exercise of reasonable diligence could have made itself aware, of the scheme through which the SBCP Loan Proceeds

66

were unlawfully obtained by SBCP through the Insider Defendants' self-dealing and pilfering of funds from the Debtor under the guise of the SBCP Notes.

201.    The circumstances are such that it would be against equity and good conscience to permit the Unjust Enrichment Defendants to retain funds or assets acquired with or derived from funds originating from the Debtor and ill-gotten gains derived therefrom. These Defendants have an obligation to the Debtor to make restitution for such monies and ill-gotten gains, and to disgorge all profits, gains and other benefits derived from the illicit transfers made for their benefit.

202.    The Unjust Enrichment Defendants have failed to make restitution to the Debtor for their ill-gotten gains, as a result of which the Foreign Representatives demand that restitution and disgorgement of all profits, gains and benefits in an amount to be proved at trial.

**COUNT XIII**
**IMPOSITION OF CONSTRUCTIVE TRUST UNDER FLORIDA LAW**
(In Rem Action Against Real Properties Owned by Founder Defendants, Beast Capital, Silverback Affiliates, Alos and Family Trusts)

203.    The allegations of paragraphs 1 through 108 and 180 through 202 are incorporated and realleged herein.

204.    As described more fully in the foregoing Count and reflected in the Exhibit P hereto (the "Unrealized Real Estate Transactions Chart"), the Unjust Enrichment Defendants have been unjustly enriched at the expense of the Debtor.

205.    The actions of the Insider Defendants, through SBCP and the Silverback Affiliates, have conferred a benefit on the Unjust Enrichment Defendants through their receipt and use of the SBCP Loan Proceeds to acquire various properties. The Unjust Enrichment Defendants have accepted and retained those benefits, including their investments in real properties funded in whole or in part by the SBCP Loan Proceeds, under circumstances that make it inequitable to retain their interests in those properties without payment to the Debtor. The benefits derived by the Unjust

Enrichment Defendants include, without limitation, the use, benefit, profit and gain derived from the real estate investments acquired with the SBCP Loan Proceeds in the names of Unjust Enrichment Defendants.

206.    As the Founder Defendants fraudulently created and used the Silverback Affiliates as instrumentalities to acquire assets with the SBCP Loan Proceeds for their own financial benefit, and involved the other Unjust Enrichment Defendants in the fraudulent scheme, each of those Defendants must be deemed to hold the assets so acquired on constructive trust for the benefit of the Debtor.

207.    The Debtor has been injured and harmed, and is likely to sustain even further injury and harm resulting from actions taken by the Unjust Enrichment Defendants in respect of properties that they still own.

208.    Accordingly, the Foreign Representatives demand the imposition of a constructive trust over the real and personal property held by the Unjust Enrichment Defendants, in an amount sufficient to provide for the recovery of all of the SBCP Loan Proceeds invested in such properties, along with the profits, gains and benefits accruing thereon, including consequential gains, realized and unrealized, that the Unjust Enrichment Defendants have received, directly or indirectly.

## COUNT XIV
## ACCOUNTING
(against Insider Defendants, Beast Capital, Silverback Affiliates, Alos and the Family Trusts)

209.    The allegations of paragraphs 1 through 108 and 180 through 202 are incorporated and realleged herein.

210.    Each Insider Defendant was in a confidential or fiduciary relationship with the Debtor, and as an agent or employee of the Debtor was entrusted with money or other assets of the Debtor.

211.    Each Insider Defendant engaged in an extensive and prolonged scheme to defraud the Debtor of its money or other assets, with the use and benefit of the SBCP Loan Proceeds and the profits and gains derived therefrom inuring to their personal benefit, and to the benefit of Defendants Beast Capital, the Silverback Affiliates, Alos and the Family Trusts.

212.    All of the Unjust Enrichment Defendants engaged in and profited from extensive or complicated transactions financed, in whole or in part, through the use and application of the SBCP Loan Proceeds. All such Defendants either actively participated in, and played an important role in, the orchestration, planning, perpetration, and or execution of the scheme to defraud the Debtor, or derived personal financial profit and gain from those wrongful acts.

213.    The transactions by which the Unjust Enrichment Defendants derived profits, gains and benefits from the SBCP Loan Proceeds are so numerous and complicated that Plaintiffs cannot assert a specific sum, and the information necessary to determine that amount is within the exclusive knowledge of those Defendants and Defendant Jimenez. The total amount of the gains, profits and benefits derived from the use and application of the SBCP Loan Proceeds is unknown and cannot be ascertained without an accounting.

214.    As a result, each of the Defendants named in this Count of the Complaint should be compelled to provide to Plaintiffs a full and complete accounting of their profits, gains and benefits derived from the SBCP Loan Proceeds by the Unjust Enrichment Defendants, including but not limited to any amounts obtained through third-party financing secured by liens or mortgages on any of the real property so acquired, or through the transfer or disposition of any interest in any such real property for cash or other consideration, including consideration in the form of a reduction or satisfaction of other obligations owed by any Unjust Enrichment Defendant to the transferee.

69

## COUNT XV
## <u>PRELIMINARY AND PERMANENT INJUNCTION UNDER SECTION 895.05, FLA. STAT.</u>
(against Founder Defendants, Beast Capital, Silverback Affiliates, Alos and Family Trusts)

215.    The allegations of paragraphs 1 through 214 are incorporated and realleged herein.

216.    Plaintiffs seek preliminary and permanent injunctive relief, pursuant to section 105(a) of the Bankruptcy Code, Rule 7065 of the Bankruptcy Rules, and Florida Statute § 895.05(6), as interpreted in the case of *Rodriguez v. Banco Industrial de Venezuela, C.A*., 576 So.2d 870, 872 (Fla. 3d DCA 1991), preliminarily and permanently enjoining the Unjust Enrichment Defendants, their officers, agents and assigns from transferring, encumbering or otherwise disposing of such real and personal property held by them as may be directed by the Court.

217.    Section 105(a) provides that this Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

218.    Florida Statute section 895.05(6). provides as follows:

Any aggrieved person may institute a proceeding under subsection (1). In such proceeding, relief shall be granted in conformity with the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases, except that no showing of special or irreparable damage to the person shall have to be made. Upon the execution of proper bond against damages for an injunction improvidently granted and a showing of immediate danger of significant loss or damage, a temporary restraining order and a preliminary injunction may be issued in any such action before a final determination on the merits.

As Foreign Representatives in the underlying Chapter 15 case in which this adversary proceeding arises, Plaintiffs are entitled, upon motion, notice and hearing, to the entry of a temporary restraining order and/or preliminary injunction without the necessity of bond.

219.    All of the relevant factors under section 895.05 and "the principles that govern the granting of injunctive relief from threatened loss or damage in other civil cases" are satisfied here.

70

Plaintiffs are likely to succeed on the merits, based the systematic looting of the Debtor and its PASP portfolio over a period of many years through the artifice and device of the SBCP Notes.

220.    Second, the balance of harms in this case favors the issuance of injunctive relief. Certain of the Unjust Enrichment Defendants have continued to transfer or dissipate their assets since the appointment of the Plaintiffs as Foreign Representatives in the underling Chapter 15 case, making it increasingly difficult for Plaintiffs to collect on any future judgment against them. Under section 895.05(6) as cited above, temporary and preliminary injunctive relief may be granted if there is an immediate danger of significant loss or danger to the plaintiff, whether or not the threatened is irreparable. In comparison, the legitimate rights and interests of the Unjust Enrichment Defendants can be protected by the entry of clearly defined injunctive relief that will not deprive them of the ability to utilize other assets to meet their legitimate personal, business and family expenses.

221.    Finally, the issuance of injunctive relief as described in this Count will be in the public interest, as it will enhance the ability of Plaintiffs to achieve a meaningful recovery for the benefit of participants in the Debtor's PASP portfolio.

222.    In connection with the issuance of the injunctive relief sought in this Count, no security should be required pursuant to Bankruptcy Rule 7065 and Fed. R. Civ. P. 65(c), in that the Debtor's PASP portfolio has been rendered insolvent by the willful, wrongful and fraudulent acts of the Insider Defendants, from which the Unjust Enrichment Defendants have benefited. . Any harm to the Unjust Enrichment Defendants as a result of any preliminary injunctive relief tailored as suggested above will be minimal. Therefore, no security bond is appropriate in this case.

223.    No prior application for the relief requested herein has been made to this Court or any other court.

224.    A preliminary and permanent injunction should therefore issue against the Unjust Enrichment Defendants, together with their agents, employees, and/or representatives, and any and all persons acting under Defendants' direction or control are enjoined from the following activities, until further order of the Court or Plaintiffs' written consent: 1) taking any action with regard to any property interests, which are or were acquired with the SBCP Loan Proceeds, or the profits, gains and proceeds derived from such Proceeds, including but not limited to those interests specifically listed in the Unrealized Real Estate Transactions Chart; 2) transferring or secreting any property interests of the Debtor or PASP that they have conveyed; 3) transferring or secreting any liquid assets they hold as a result of conveying assets acquired with the SBCP Loan Proceeds; and 4) transferring, pledging, encumbering, hypothecating or secreting any property, tangible or intangible, obtained with the SBCP Loan Proceeds, all as may be determined by the Court after notice and hearing.

## VII.
## STATEMENT OF RELIANCE ON FOREIGN SOURCES OF LAW

Pursuant to Federal Rules of Civil Procedure 44.1, made applicable to this adversary proceeding by Bankruptcy Rule 9017, the Plaintiffs gives notice that this Complaint raises issues of foreign law, specifically that of the Cayman Islands.

## VIII.
## RESERVATION OF RIGHTS

The Foreign Representatives' investigation and efforts to discover into the matters alleged in the Complaint and assert additional claims against the named Defendants and Doe Defendants remain ongoing. As the Court is aware, certain of the Defendants and their affiliates have appeared in the Chapter 15 Case and acted to delay and obstruct this investigation through the repeated filing of objections and motions to quash subpoenas and for protective orders -- each of which objections and motions has been overruled, denied or withdrawn -- and protracted litigation over access to

certain of the computer data captured by the Plaintiffs upon their appointment as Foreign Representatives. Accordingly, Plaintiffs reserve their right to amend this Complaint to add, modify or supplement factual allegations, legal theories, and causes of action, and to commence additional actions or proceedings as may be necessary or appropriate to hold the Defendants and their affiliates accountable for the fraud, defalcation, self-dealing and other harms inflicted by the Defendants and related parties on the Debtor and its participants.

## IX.
## PRAYER FOR RELIEF

WHEREFORE, the Foreign Representatives demand and relief against the Defendants as follows:

A.    As to each of Counts I-III, the entry of Judgment awarding general, compensatory, consequential and punitive damages and treble damages according to statute, jointly and severally against the Defendants named therein, together with attorneys' fees and costs as provided under the statutory provisions cited in each such Count;

B.    As to Count IV, the entry of Judgment awarding damages or equitable compensation in an amount to be determined by the Court, against each of the Defendants named therein; further or alternatively, an account of profits made by the Founder Defendants from their breaches of fiduciary duty and/or equitable compensation (including, but not limited to, all sums misappropriated by the Insider Defendants and each of them and/or paid away at their direction) and an order for payment to the Debtor of all sums found due upon the taking of the account; further or alternatively, a declaration that the Founder Defendants hold any funds or property that they received in breach of fiduciary duty and/or the traceable proceeds of the same and/or profits made by them as a result of such breaches and/or any profits thereon, on constructive trust for the Debtor; further, an

order that any such Defendant execute and deliver to Plaintiffs such documents or complete such acts as required to vest legal ownership of such assets in the Debtor, together with any other and further directions and relief (including all necessary accounts and inquiries to determine the amount of any damages and/or profits payable by the Insider Defendants to the Debtor), all in accordance with the laws of the Cayman Islands governing breach of fiduciary duty;

C.      As to Count V, the entry of Judgment awarding damages in a sum to be determined by the Court, jointly and severally against the Defendants named therein, in accordance with the laws of the Cayman Islands governing unlawful means conspiracy;

D.      As to Count VI, a declaration that each of the Defendants named therein is liable to account to the Debtor to restore or make good the value of the property received in a sum to be determined by the Court, or such other sum as the Court thinks fit on the ground of knowing receipt; further, an order that each of the Defendants pay to the Debtor such amount as be determined by the Court or such sum as the Court thinks fit, all in accordance with the laws of the Cayman Islands governing knowing receipt; further or alternatively, a declaration that the Debtor is entitled to trace any identifiable trust property retained by any of the Defendants and/or any identifiable substitute of such property ('including, but not limited to, any profits derived from the sale or transfer of any interest in any such property, along with other gains and benefits realized from the ownership of such property) and the Plaintiffs claim equitable title to such property; and further a declaration that each of the Defendants holds any such identifiable trust property and/or any identifiable substitute of such property on trust for the Debtor and an order that any such Defendant execute and deliver such documents or complete such acts as required to

74

vest legal ownership of such assets in the Debtor, together with any other and further directions and relief, all in accordance with the laws of the Cayman Islands;

E.      As to Count VII, a declaration that Defendant Jimenez is liable to account to the Debtor in an amount to be determined by the Court or such sum as the Court thinks fit on the ground of his dishonest assistance in respect of each of the breaches of trust and/or fiduciary duty in which he actively participated and dishonestly assisted or procured; and further an order that Defendant Jimenez pay to the Debtor such sum to be determined by this Court or as the Court thinks fit, together with any other and further directions and relief, all in accordance with the laws of the Cayman Islands;

F.      As to Count VIII, the entry of Judgment awarding general, compensatory and consequential damages in an amount to be determined by the Court, disgorgement by the Founder Defendants of all profits and benefits obtained by each of them through the real estate investments acquired with funds of or derived from the Debtor, and punitive damages under Florida law;

G.      As to Count IX, the entry of Judgment awarding damages according to statute including treble damages, jointly and severally against the Defendants named therein, together with attorneys' fees and costs as provided under the statutory provisions cited in such Count;

H.      As to Count X, the entry of Judgment for general, compensatory, consequential and punitive damages against each Defendant named in such Count, jointly and severally, in amounts to be proved at trial;

I.      As to Counts XI and XII, the entry of Judgment against each Defendant named in such Count, jointly and severally, awarding restitution and disgorgement of all

gains, profits and benefits derived as a result of the actions alleged in such Count, in an amount to be proved at trial, together with such other equitable relief as the Court deems just and proper;

J.      As to Count XIII, the entry of Judgment imposing a constructive trust over the real and personal property held by the Defendants named in such Count, in an amount sufficient to provide for the recovery of all of the SBCP Loan Proceeds invested in such properties, along with the profits, gains and benefits accruing thereon, including consequential gains, realized and unrealized, that said Defendants have received, directly or indirectly;

K.      As to Count XIV, the entry of Judgment directing each Defendant named in such Count to provide a full and complete accounting of their profits, gains and benefits derived from the SBCP Loan Proceeds, including but not limited to any amounts obtained through third-party financing secured by liens or mortgages on any of the real property so acquired, or through the transfer or disposition of any interest in any such real property for cash or other consideration, including consideration in the form of a reduction or satisfaction of other obligations owed by any such Defendant to the transferee;

L.      As to Count XV, the entry of Judgment providing preliminary and permanent injunctive relief, of such nature, extent and scope as determined by the Court after notice and hearing; and

M.      As to all Counts, the entry of Judgment awarding such other and further legal and equitable relief as the Court finds just and proper.

Dated: September 19, 2022

Respectfully submitted,

**BAKER & McKENZIE LLP**


By:/s/ Mark D. Bloom

Mark D. Bloom
FL Bar No. 303836
Mark.Bloom@bakermckenzie.com
John R. Dodd
FL Bar No. 38091
John.Dodd@bakermckenzie.com
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953

## **EXHIBITS**