# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

In re:

Premier Assurance Group SPC Ltd.,

      Debtor in a Foreign Proceeding.

_____/

JEFFREY STOWER and JASON ROBINSON, as Foreign Representatives of PREMIER ASSURANCE GROUP SPC LTD,

      Plaintiffs,

v.

LEONARDO L. CORNIDE, individually and as Trustee of The Falcon Family Irrevocable Trust, JORGE E. FALCON individually and as Trustee of The Cornide Family Irrevocable Trust, JAVIER JIMENEZ (also known as JAVIER JIMENEZ, JR.), ANDRES ALOS, ALEXANDER GUERRA, as Trustee of the Andres Alos Family Irrevocable Trust, SILVERBACK CAPITAL PARTNERS LLC, BEAST CAPITAL LLC, 117 ALBATROSS LLC, 301 DALE LLC, 900 DALE LLC, 975 DALE LLC, PREFERRED BUSINESS SERVICES INC., PA MARKETING LTD., 45 SBH LLC, 1736 SBH LLC, 2000 SBH LLC, 2170 SBH LLC, 74560 SBH LLC, SILVERBACK INVESTMENTS LLC, 248 SILVERBACK INVESTMENTS LLC, 1901 SILVERBACK INVESTMENTS LLC, 1919 SILVERBACK INVESTMENTS LLC, SILVERBACK EQUITY PARTNERS LLC, SILVERBACK MANAGEMENT SERVICES LLC, SBH MANAGEMENT SERVICES LLC, SILVERBACK MIDTOWN, LLC, SILVERBACK VENTURES LLC, and DOES 1-10,,

      Defendants.

_____/

Chapter 15

Case No. 20-20230-RAM

Adv. No. 22-01260-RAM

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT JAVIER JIMENEZ'S MOTION TO
DISMISS COUNTS I-III OF THE AMENDED COMPLAINT**

Plaintiffs, Jeffrey Stower and Jason Robinson, in their capacity as authorized Foreign Representatives ("Plaintiffs" or "Foreign Representatives") and Joint Official Liquidators ("JOLs") of Premier Assurance Group SPC, Ltd. (In Official Liquidation) (the "Debtor") by and through undersigned counsel, respectfully submit the following Response in Opposition to Defendant Javier Jimenez's Motion to Dismiss Counts I–III of Plaintiffs' Amended Complaint [ECF No. 214] and state:[1]

**INTRODUCTION**

After filing the original Complaint and reviewing the Court's bench ruling on Defendant Jimenez's Motion to Dismiss, Plaintiffs launched a further investigation into the slowly expanding cache of available Captured Data and uncovered extensive new information detailing the mechanics of the fraudulent scheme, as well as Defendant Jimenez's specific role in its execution. Armed with this additional information, Plaintiffs prepared the Amended Complaint, ECF No. 196, which more specifically and clearly sets forth Defendant Jimenez's criminal intent as well as the predicate acts he committed as part of and in furtherance of the scheme.

Succinctly, Defendant Jimenez knowingly and willfully participated in a fraudulent scheme to misappropriate the Debtor's money, including through the artifice of the SBCP Notes and fraudulent notations of "marketing fees," for the personal benefit of the Founder Defendants and to the detriment of the Debtor. ECF No. 196 at ¶¶ 155-59, 230-232, 282, 294. Defendant Jimenez's predicate criminal acts in furtherance of the scheme include and involve the use of interstate wire transmissions in: 1) preparing and transmitting the sham SBCP Notes that were

---

[1] Capitalized terms not otherwise defined shall have the same meaning as set forth in the Amended Complaint.

devised and intended to conceal the true purpose of the transfers over a period of many years *id.* at ¶¶ 115, 117, 119; 2) making or causing to be made interstate bank wire transfers of funds from the Debtor's bank accounts directly or indirectly to entities owned by the Founder Defendants for purposes of carrying out the scheme, *id.* at ¶¶ 217-218, 227-229; 3) knowing that the regulators required the SBCP Notes to be secured, falsely representing to Captiva, BDO, and CIMA that the Notes were collateralized and collectible, *id.* at ¶¶103-113, 236-238; and 4) knowing that the transfers to PA Marketing under the guise of "marketing fees" were not actually spent on marketing, fraudulently representing to the Debtor, BDO and RSM that the money transferred was used for marketing. *Id.* at ¶¶ 234-239.

Despite these revisions to the allegations, Defendant Jimenez challenges the sufficiency of the allegations regarding his knowledge of and participation in the fraud. But in so doing, Jimenez repeatedly ignores the most damning allegations of that knowledge and participation, including that he designed and executed the Round-trip-Double-Dip, *id.* at ¶¶ 173-177; repeatedly deceived auditors, *id.* at ¶¶ 234-239; and flatly lied to the regulators. *Id.* at ¶¶ 107, 236. Reading between the lines, Jimenez's main defense to the Amended Complaint is that he was acting at the direction of the Founder Defendants; that he did not benefit from the scheme; and that he is ill-suited to withstand or pay for the litigation caused, in part, by his conduct.

These pleas for pardon and favor are illusory and insufficient as a matter of law. Executives and employees who engage in racketeering activities are not immune from suit due to their station or their lack of profit from the scheme. Nor may they hide behind the oft repeated, but rarely accepted defense, "I was only doing what I was told." The law holds them accountable for their criminal conduct. Defendant Jimenez's motion to dismiss should be denied.[2]

---

[2] In addition to the arguments addressed below, Jimenez also makes a curious argument that Plaintiffs cannot establish continuity because he is no longer (as of January) employed by the

## Summary of the Allegations

The Insider Defendants, the directors and executives of a multinational insurance company, engaged in intentional, fraudulent activities, misappropriating tens of millions of dollars from the Debtor. *Id.* at ¶¶ 1-5, 8, 99-103, 151-154, 155-159. The money that they embezzled was diverted to separate entities that the Founder Defendants owned and controlled, for their own use and benefit, including to build a real estate empire. *Id.* at ¶¶ 8, 98, 121-128. Defendants did so under the cover of sham promissory notes and through affiliated entities. *Id.* at ¶¶ 8, 88-98, 107-108, 115, 151-154. As alleged, the SBCP Notes were shams, intended to paper the file, and to provide false cover for the transfer of millions of dollars for the use of the Founder Defendants. *Id.* at ¶¶ 5, 88-98. While acting and holding himself out as the Debtor's Chief Financial Officer (*id.* at ¶19), Defendant Jimenez knowingly joined the scheme to divert millions of dollars from the Debtor, and was directly involved in the commission of at least two predicate offenses. *Id.* at ¶ 99.

Jimenez's knowledge of and participation in the scheme are demonstrated by the following allegations, among others:

- Knowing that the statements within the SBCP Notes were untrue and that the purpose of the transfers was for the personal benefit of the Founder Defendants, to the detriment of the Debtor, Defendant Jimenez—who actively participated in the preparation and review of the SBCP Notes (*id.* at ¶ 82-83)—authorized and directed the fraudulent transfer of millions of dollars from the debtor's accounts, directly or indirectly, into and through SBCP. *Id.* at ¶¶ 100, 124.

- Defendant Jimenez also falsely represented to financial auditors (namely, BDO) that the 2015 Note was collateralized by real estate, *id.* at ¶ 103, and withheld the fact that PASP's rights under the 2015 SBCP Note were subordinate to first, and in some instances, second priority liens. *Id.*

- In response to BDO and Captiva's request to provide documents supporting SBCP's contractual right to collect on the loans owed from the Silverback Affiliates to SBCP,

---

Founder Defendants. This novel argument that, in essence, his recent separation from the Founder Defendants immunizes him from liability for his prior bad acts is unsupported and, in any event, the Court previously held that Plaintiffs' satisfy the continuity requirement. ECF No. 102 at 33:4-7.

Defendant Jimenez asked Defendant Alos to urgently draft non-existent loan documents, which remain unrecorded, to provide the false assurance that the loans were collectible. *Id.* at ¶¶ 104, 145.

- In response to BDO's concern that SBCP was functioning like an "unsecured credit facility," Jimenez suggested to the Founder Defendants that they modify the then outstanding 2017 SBCP Note to include personal guarantees from the Founder Defendants, which they did. *Id.* at ¶ 106.

- Defendant Jimenez knew that amending the SBCP Note to include reference to the personal guarantees was fraudulent. Neither the Founder Defendants, nor Defendant Jimenez, ever intended to, nor did they provide or obtain, the guarantees. *Id.* at ¶¶ 107-108. Indeed, the reference to personal guarantees was nowhere to be found in the next SBCP Note issued in 2019.

- Defendant Jimenez assisted the Founder Defendants to provide false and misleading management representation letters to the Debtor's Auditors that they had complied with all aspects of contractual agreements, such as the SBCP Notes, falsely stating unequivocally that the "all promissory notes are secured by the underlying collateral securing the loans issued by SBCP." *Id.* at ¶ 113.

- Defendant Jimenez was not a low-level employee, but instead a sophisticated executive, who facilitated and perpetuated the scheme. Jimenez made misrepresentations to banking institutions (e.g., Valley National Bank), financial auditors (BDO and RSM), insurance managers, and foreign regulators (CIMA). *Id.* at ¶¶ 110-111, 238. Jimenez knew that the Debtor's auditor, insurance manager, and CIMA required the SBCP Notes to be secured. *Id.* at ¶ 236. Knowing that they were not secured, but were shams, Jimenez "misrepresented in email communications to those and other third parties at various times that the SBCP notes were collateralized and collectible." *Id.*

- In addition to transferring tens of millions of dollars from the Debtor to and through SBCP and as otherwise described in the Amended Complaint, Defendant Jimenez concealed the true nature of myriad transfers in the Books and Records. For example, Jimenez was involved in drafting the promissory note for PASP to fund the purchase of Cornide's personal home, then recorded the transaction in PASP's General Ledger as a receivable owed to the Debtor by Silverback Investments. *Id.* at ¶ 101.

- Knowing that the Debtor was prohibited from issuing new loans, Defendant Jimenez authorized and facilitated transfers of SBCP Loan Proceeds for the benefit of SBCP rather than reducing the balance on the notes. *Id.* at ¶ 109.

- Defendant Jimenez falsely represented to the audit firm RSM that a specific real property was a rental investment property owned by the Debtor when he knew that the property in question was Defendant Cornide's personal vacation home. *Id.* at ¶ 110.

- Defendant Jimenez falsely represented to City National Bank that Defendant Cornide's personal wealth included the value of the real estate investments held by Silverback Affiliates. *Id.* at ¶ 111.

- Defendant Jimenez received commissions from certain of the real estate transactions in addition to the salary he received from PBS (an entity owned and/or controlled by the

Founder Defendants) and other benefits including travel via private jet, ski trips, and, upon information and belief, payment of legal fees associated with this litigation. *Id.* at ¶ 128.

- Jimenez knew that the transfers from the Debtor to PA Marketing under the guise of "marketing fees" were not actually spent on marketing, but misrepresented this fact to others, including employees of the Debtor, BDO, and RSM, and to a representative at Valley National. *Id.* at ¶ 237.

- Jimenez knowingly participated in the "round-tripping transactions" summarized in Exhibit M of the ECF No. 196; indeed, it was Defendant Jimenez who knowingly orchestrated each step in this coordinated series of related party transfers on an expedited basis to meet a deadline imposed by the SEC; indeed, the intricate Round Trip Double Dip could not have been accomplished without his active participation and direction. *Id.* at ¶¶ 173, 175-176.

- Knowing that the letter to Valley National Bank falsely represented that the Founder Defendants did not personally benefit from the SBCP Loan Proceeds, Jimenez nonetheless transmitted the letter to banks, including Valley National and regulators including the Financial Services Commission of Florida. *Id*. at ¶ 193.

## ARGUMENT

**I.    The Amended Complaint Properly Pleads Each Predicate Act[3]**

**A.    Wire Fraud**

**i.    Plaintiffs Adequately Pled Defendant Jimenez's Criminal Intent**

Defendant Jimenez's central argument is that Plaintiffs fail to plead criminal intent. *See* ECF No. 214 at 6-12. According to Jimenez, he "acted at all times on behalf of, and at the direction of, the Debtor and SBCP, and the Founder Defendants held ultimate control over the Debtor, SBCP and Jimenez." *Id.* Moreover, Jimenez seeks to insulate his conduct because, according to him, he did not benefit from, and therefore had no motive to participate in, the scheme. *Id.* at 8. Jimenez's arguments are unavailing: Plaintiff's allegations relating to his knowing and voluntary participation in the scheme are more than sufficient.

---

[3] Defendant Jimenez contends that Count III (asserting a violation of Florida's RICO statute) should be dismissed for the same reasons argued in support of his Motion to Dismiss Count I. *See* ECF No. 214 at 25-26. For all of the reasons set forth herein, Defendant Jimenez's argument as to Count III likewise fails.

The elements of wire fraud are: 1) intentional participation in a scheme or artifice to defraud and 2) the use of interstate wire transmissions in furtherance of the scheme. 19 U.S.C. § 1343; *United States v. Watkins*, 42 F.4th 1278, 1283 (11th Cir. 2022). Section 1343 reaches "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises . . . The concept of fraud includes the act of embezzlement, which is the fraudulent appropriation to one's own use of the money or goods entrusted to one's care by another." *Carpenter v. United States*, 484 U.S. 19, 27 (1987); *see also United States v. Redcorn*, 528 F.3d 727, 737 (10th Cir. 2008); *Nair v. Patel*, 2022 WL 16543280, at * 5 (N.D. Ga. Jan. 13, 2022). Further, the element of intent to deceive or defraud, an inherent part of any fraud-based claim, requires only a showing of the defendant's state of mind, for which general allegations are sufficient. Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other condition of mind of a person may be averred generally."); *see Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc) ("The only aspects of wire fraud that require particularized allegations are the factual circumstances of the fraud itself.").

The Eleventh Circuit case *United States v. Toll*, 804 F.3d 1344 (11th Cir. 2015) is instructive. In that case, the chief financial officer of a holding company was convicted of wire fraud and conspiracy to commit wire fraud, among other things. The defendant was involved in scheme to obtain a government loan where the money was used for unapproved purposes, including to fund affiliated businesses. *Id*. at 1352. On appeal, Toll argued that the evidence failed to prove that he knew of or participated in the fraud. *Id.* at 1357. The Eleventh Circuit disagreed, stating: "sufficient evidence established that Toll knew the loan proceeds were not used in accordance with the contract." *Id.* Toll also made misrepresentations to the government agency, and he forwarded an altered email. *Id.*

Similarly, here, there are ample allegations that show that Defendant Jimenez, like CFO Toll, knew of and participated in the scheme to embezzle money from the Debtor. ECF No. 196 at ¶¶ 8, 99-103, 151-154, 155-159, 173, 175-176. Plaintiffs have alleged that Jimenez transferred money from the Debtor to SBCP for the use and benefit of the Founder Defendants, knowing full-well that the money was not going to be used appropriately, but instead was intended to build a real estate empire in the Founders' name, and otherwise to be used as the Founders saw fit. *Id.* at ¶¶ 8, 98(a), 121-125. Plaintiffs allege that Jimenez knew that funds diverted from the Debtor were used to purchase Cornide's personal home, and falsely recorded that illicit transfer as a "loan" to an entity called Silverback Investments *id.* at ¶¶ 8, 100-101; that he knew that the money was used to fund home renovations and was recorded in the books and records in a manner to obscure those transactions; that he knew that transfers were not collateralized and lied to conceal that fact, *id. at* ¶ 101; that he used Debtor money to pay the personal obligations of the Founders to the SEC, *id.* at ¶¶ 168-171. Jimenez's knowing and intentional participation in the scheme and the many transactions through which it was implemented is alleged throughout the Amended Complaint with great particularity.

### a.    Jimenez's Actions Are Not Imputed to the Debtor

Jimenez's argument that his actions are imputed to the Debtor and that this imputation constitutes an absolute defense is both spurious and deceptive. *See* ECF No. 214 at 6. Citing *Banco Latino Int'l*, 95 F. Supp. 2d at 1336, Jimenez curiously omits a very important part of the sentence upon which he purports to rely, reflected here in italics:

> Under the rule announced in *Gee* [625 So. 2d 1 (Fla. 3d DCA 1993)], actions taken by an officer or director in his official capacity are imputed to the corporation and constitute an absolute defense to subsequent lawsuits by the corporation, *unless the corporation derived absolutely no benefit from those actions (i.e., the actions benefitted only the officer or director's pecuniary interests)*.

*Banco Latino*, 95 F. Supp. 2d 1327 at 1336 (emphasis added).

Needless to say, this omitted language recognizes precisely the fundamental exception that governs the disposition of Jimenez's flawed argument. Where a director is acting adversely to the corporation, the officer's knowledge and conduct are not imputed to the corporation. *See Seidman & Seidman v. Gee*, 625 So. 2d 1, 2 (Fla. 3d DCA 1992) (citing *Cenco Inc. v. Seidman & Seidman*, 686 F.3d 449 (7th Cir. 1982)). So, for example, when "the officers and directors of a parent corporation [loot] the insurer of its most profitable business and whose fraudulent acts caused the insurer to continue in business past the point of insolvency[,]" the wrongdoing of the directors is not imputed to the corporation. *Id.* (citing *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983)). On the other hand, where the fraud is directed to a third party, and benefits the corporation, the conduct of the director is imputed to the corporation. *Banco Latino*, 95 F. Supp. 2d at 1335-36. Here, Jimenez's conduct may not be imputed to the Debtor because the fraud was committed against and to the detriment of the Debtor, inflicting "real damage on the corporation by diminishing its assets and income, a result that was not beneficial to the corporation." *Id.*[4] Accordingly, Jimenez's imputation argument and his plea for this "absolute defense" fails.

### b.    Jimenez's Financial Benefit is Immaterial

It is wholly immaterial that Jimenez (allegedly) did not personally receive the proceeds of the fraud. Notably, in *National Organization for Women v. Scheidler*, the Supreme Court unanimously concluded that a violation of RICO does not require a plaintiff to plead and prove that a defendant had an "economic purpose" in engaging in the predicate acts. 510 U.S. 249, 257 (1994) ("Nowhere in either § 1962(c) or the RICO definitions in § 1961 is there any indication that an economic motive is required."). Consistent with that principle, the Eleventh Circuit has

---

[4] Moreover, in *Welt v. Sirmans*, 3 F. Supp. 3d 1396 (S.D. Fla. 1997), Judge Nesbitt recognized an exception to Florida's imputation rule in cases brought to vindicate the rights of a defunct corporation by a bankruptcy trustee, which exception applies with equal force to the facts of this case.

reiterated that a defendant "never directly received the proceeds of the fraud is immaterial …. By playing along with the fraud scheme, [Defendant] was able to remain employed in a management position, and received a respectable salary for allowing the fraud scheme to fester unabated." *Toll*, 804 F.3d at 1357 (affirming the conviction of a chief financial officer who participated in a scheme to defraud investors).

Likewise here, Jimenez's contention that he did not receive the proceeds of the fraud is immaterial. *Scheidler*, 510 U.S. at 257. Like the defendant in *Toll*, Jimenez acted knowingly to advance the fraudulent scheme, allowing him to remain employed in a management position where he received a salary and other benefits of his continued employment. *Toll*, 804 at 1357. Accordingly, the Amended Complaint more than satisfies the necessary pleading standards as it relates to Jimenez's criminal intent.

### ii.    Defendant Jimenez "Caused" the Use of the Wires to Execute the Scheme

Next, Defendant Jimenez argues, without reference to any legal authority, that "merely sending wires is not sufficient" to plead wire fraud as a predicate offense. *See* ECF No. 214 at 15-16. To the contrary, the law is clear that "innocent" and "routine" mailings, even if they do not contain false information, constitute fraud when utilized as part of a fraudulent scheme. *Schmuck v. United States*, 489 U.S. 705, 715 (1989) (construing the mail fraud statute). Proof of wire fraud does not focus on explicit false statements in the communications themselves but instead on the *fraudulent schemes* for which the wires are used. As the Supreme Court explained in *Schmuck*, the "gravamen of the offense is the scheme to defraud," and any "mailing that is incident to an essential part of the scheme satisfies the mailing element." *Schmuck*, 489 U.S. at 712 (citation omitted). Similarly, the Eleventh Circuit has specifically held that interstate wire transfers used to further the fraudulent scheme constitute wire fraud, stating "[a]n interstate wire transmission is 'for the

purpose of executing' the scheme to defraud if it is 'incident to an essential part of the scheme' or 'a step in the plot.'" *United States v. Hasson*, 333 F.3d 1264, 1272-73 (11th Cir. 2003) (quoting *Schmuck*, 489 U.S. at 710-11). "Section 1343 targets not the defendant's creation of the scheme to defraud, but the defendant's *execution* of a scheme to defraud." *United States v. Williams*, 527 F.3d 1235, 1241 (11th Cir. 2008) (affirming conviction of chief financial officer).

Here, as recognized by this Court, the scheme to defraud was the embezzlement of millions of dollars from the Debtor. ECF No. 196 at ¶¶ 1-5, 8, 151-154, 155-159. As set forth above, Defendant Jimenez knowingly participated in that scheme. *See also id.* at ¶¶ 99-103. Further, the transfer of money from the Debtor to the affiliate entities was incident to an essential part of the scheme—namely, siphoning money—and represents the execution of the scheme to defraud. To reiterate but briefly, Defendant Jimenez actively participated in the preparation and review of the SBCP Notes, *id.* at ¶ 121, and authorized and directed the fraudulent transfer of tens of millions of dollars from the Debtor's accounts, directly or indirectly, into SBCP and PA Marketing. *Id.* at ¶¶ 100, 124. Each of these transfers are set forth in great detail in the SBCP Transfers Chart, the PA Marketing Transfer Chart, and the Siphoned Funds Chart. *Id.* at ¶¶ 217, 155-159, 160, respectively; ECF Nos. 196-9, 196-10, 196-14.

In addition, Plaintiffs' allege that Defendant Jimenez was personally responsible for the round-tripping and double accounting transactions wherein he directed money to be transferred directly or indirectly from the Debtor to the Securities and Exchange Commission to satisfy the Founder Defendants' personal obligations and fines, *id.* at ¶¶ 175-176, Exhibit M, and also responsible for the illegitimate transfer of money from the Debtor to PA Marketing. *Id.* at ¶ 237. These interstate transactions were made for the purpose of executing the scheme to defraud and

were "an essential step in the plot." Accordingly, Plaintiffs properly allege predicate acts of wire fraud against Defendant Jimenez.[5]

The Amended Complaint also alleges predicate acts in addition to the interstate transfer of money, including Jimenez's prolific role in the fraudulent scheme through his concerted and repeated efforts to mislead auditors, insurance managers, and regulators by way of material misrepresentations in transmissions sent to the third parties. ECF No. 196 at ¶¶ 103-113, 236-38. Yet, Jimenez makes virtually no effort to address the extensive factual allegations concerning such conduct, instead stating, without citation to any allegation in the complaint, that he "corrected any erroneous entries, and [that] it is already in the record in this case that the Debtor routinely did a 'true up' at the end of the fiscal year, which is standard practice." ECF No. 214 at 17. First, what this purported "true-up" of account records has to do with the misrepresentations made to regulators is unclear. Second, the Court's evaluation at this stage is limited to the four-corners of the complaint, not the amorphous "record" to which Jimenez refers. *St. George v. Pinellas Cty.*, 285 F.3d 1334 (11th Cir. 2002). If, as an affirmative defense, Jimenez proposes to assert that these purported "year-end true-ups" somehow excuse or immunize the multi-year fraud in which he knowingly and actively participated to loot the Debtor of tens of millions of dollars, he is free to do so in an answer.

---

[5] Defendant's refrain that the Amended Complaint lacks allegations that he "unilaterally sent any money to the destination of his choosing, or that he acted independently or outside the scope of his employment," is a red herring, unsupported by the law. Indeed, Jimenez cites no authority to support the contention that the executive of a company cannot be held liable for his fraudulent conduct in furtherance of a criminal enterprise so long as the actions he takes are "within the scope of his authority" or at the direction of the corporate directors. *See, e.g.*, *Toll*, 804 F.3d at 1347 (affirming conviction of corporate CFO relating to his role in defrauding investors for the benefit of company CEO); *United States v. Redcorn*, 528 F.3d 727 (10th Cir. 2008) (finding that the government appropriately charged wire fraud despite lack of misrepresentations or false statements where defendants, the President and CFO of an insurance company, diverted participant premiums for their own use and benefit).

Next, Jimenez contends that allegations relating to his misrepresentations are deficient because, according to Jimenez, Plaintiffs did not "allege that the third parties relied on any statements made by Jimenez or that [these statements] caused any harm to the Debtor." ECF No. 214 at 17. Again, Defendant Jimenez is mistaken on the law (and the facts). "Using the mail to execute or attempt to execute a scheme to defraud is indictable as mail fraud, and hence a predicate act of racketeering under RICO, *even if no one relied on any misrepresentation*." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (emphasis added) (abrogating *Pelletier v. Zweifel*, 921 F.2d 1465, 1506-10 (11th Cir. 1991); *see also Anza*, 547 U.S., at 476 (1991) ("Because an individual can commit an indictable act of mail fraud even if no one relies on his fraud, he can engage in a pattern of racketeering activity, in violation of § 1962 without proof of reliance."). Thus, Plaintiffs' had no obligation to allege that the third party regulators, auditors, and managers relied on Jimenez's misrepresentations, although clearly they did, as the very purpose of their inquiries was to obtain assurances that the "loans" were collateralized and collectible and that certain transactions were legitimate. *See* ECF No. 214 at 103-04.

Moreover, the Debtor was injured by Defendant Jimenez's conduct and misrepresentations to third parties. These statements and assurances were incident to an essential part of the scheme because they advanced its central objective—to embezzle money from the Debtor—by providing false assurances to the third parties who had the ability and obligation to put an end to the illegal use of the Debtor's reserves.[6] *See United States v. White*, 848 Fed. Appx. 830, 843 (11th Cir. 2021) (affirming conviction for wire fraud where wires were incident to scheme to defraud investors out of money by misrepresenting the company's profitability).

---

[6] Indeed, the great irony of Jimenez's role is that in his capacity as the Debtor's Chief Financial Officer he also had a similar ability and obligation that he repeatedly overlooked in favor of acting as an essential cog in the conspiracy to loot the Debtor for the personal benefit of the Founder Defendants.

B.    **Money Laundering**

Jimenez contends that Plaintiffs failed to adequately allege the predicate act of money laundering because they did not allege "that Jimenez directed or caused the transfers" but instead contends that the "transfers were done on behalf of the Debtor and not in his individual capacity, especially in light of the fact that they do not even allege that he transferred them to or for his benefit." ECF No. 214 at 19 (internal emphasis omitted).

The Amended Complaint properly states a claim for money laundering under 18 U.S.C. § 1957. It is unlawful to "knowingly engage[]… in a monetary transaction in criminally derived property of a value greater than $10,000" that is "derived from specified unlawful activity," including wire fraud. 18 U.S.C. § 1957. "A person commits a money laundering offense when he conducts or attempts to conduct a financial transaction with money he knows to be the proceeds of an unlawful activity, with the purpose of concealing or disguising the nature, location, source, ownership or control of the proceeds." *United States v. Flynt*, 15 F.3d 1002, 1007 (11th Cir. 1994). Plaintiffs alleged that Jimenez caused and/or directed the transfers, knowing that the transfers were in criminally derived property. ECF No. 196 at ¶¶ 241-243. Jimenez's unsupported contention that the transfers must be made to him or for his benefit is not an element of the money laundering statute, as controlling cases like *Scheidler* and *Toll* confirm. *See supra* at 7-9.[7]

---

[7] Defendant contends that because Plaintiffs have not alleged the predicate act of money laundering, they have failed to satisfy the "unlawful activity" element of the predicate act of interstate and foreign travel or transportation in aid of racketeering enterprises under 18 U.S.C. § 1952. *See* ECF No. 216 at 19. However, as stated *supra*, Plaintiffs have sufficiently alleged the unlawful predicate act of money laundering and in turn have sufficiently alleged that Jimenez committed a predicate act under 18 U.S.C. § 1952.

C.    National Stolen Property Act

The Amended Complaint properly pleads violations of the National Stolen Property Act,
18 U.S.C. § 2314. The National Stolen Property Act makes it illegal to "transport, transmit, or
transfer in interstate or foreign commerce any goods, wares, merchandise, securities or money, of
the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud[.]"
§ 2314. "When a violation of § 2314 is based on transmission of funds, the statute only requires
proof that the defendant transmitted more than $5000 in interstate or foreign commerce, and that
the defendant knew the money was stolen, converted, or obtained by fraud." *Liquidation Com'n
of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1356 n.17 (11th Cir. 2008). Violations of
§ 2314 do not require proof of misrepresentation. *Id.* at 1356.

Defendant Jimenez contends that Plaintiffs failed to "plausibly allege that Jimenez knew
that the monies at issue were stolen, converted or taken by fraud[.]" ECF No. 214 at 18. Not so;
allegations pertaining to Jimenez's knowledge are legion. Throughout the Amended Complaint
Plaintiffs repeatedly allege that Jimenez had knowledge, took steps to obscure the true nature of
the transactions, and lied to third parties about the transfers. For example, Plaintiffs allege:
"Knowing that the statements within the SBCP Notes were untrue and that the purpose of the
transfers was for the personal benefit of the Founder Defendants, to the detriment of the Debtor,
Defendant Jimenez knowingly authorized and/or facilitated the fraudulent transfers from the
Debtor's accounts, directly or indirectly, into SBCP." ECF No. 196 at ¶ 100. Plaintiffs also allege
that Defendant Jimenez facilitated the transfer of money (and papering same) to purchase
Defendant Cornide's personal home, then recorded the transaction as a receivable owed by
Silverback Investments, *id*. at ¶ 101; the implication, of course, being that Jimenez manipulated
the Debtor's books and records to obscure the true nature of the transaction. And, knowing that

CIMA expressly prohibited the Debtor from issuing any new loans and to repay SBCP Notes, Jimenez "authorized and facilitated transfers of SBCP Loan Proceeds for the benefit of SBCP rather than reducing the balance of the SBCP Notes." *Id.* at ¶ 109.

In addition to the foregoing, Defendant Jimenez transferred at least $8,682,251.17 of the Debtor's money from SBCP to the Founder Defendants, Beast Capital, SMS and SBH MS LLC for no consideration or discernable purpose. *Id.* at ¶ 160; Ex. J. Plaintiffs also allege that Jimenez was responsible for the "round trip" transactions—that is, through a series of transfers, he facilitated the payment of the Founder Defendants' personal obligations under the SEC Settlement with money diverted from the Debtor through the series of transfers that he orchestrated and directed. *Id.* at ¶ 176. Each of these transfers, made in violation of the Stolen Property Act, are set forth in great detail in the exhibits attached to the Amended Complaint. *See id.* at Ex. N, J, I.

Based on these allegations, accompanied by the overriding obligations attendant to the role of a chief financial offer, it is not only plausible that Defendant Jimenez had knowledge that the Defendants stole money from the Debtor, it is likely.

## II.     Plaintiffs Validly State a Claim for Conspiracy to Violate RICO

Defendant Jimenez argues that Count II of the Amended Complaint necessarily fails because Plaintiffs failed to state a claim against him for violating RICO. ECF No. 214 at 24-25. In other words, Jimenez contends that Plaintiffs' conspiracy count may not proceed absent its substantive RICO claim. First, as set forth above, Count I is properly pled and not subject to dismissal. Second, and equally important, Defendant Jimenez is wrong on the law. "A conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997).

In *Salinas*, a sheriff, Marmolejo, and his deputy, Salinas, were indicted for violating §
1962(c) and conspiracy to violate § 1962(c) for accepting bribes from a prisoner in exchange for
allowing the prisoner to have unsupervised "contact visits" with his wife and girlfriend. *Id.* at 55.
Salinas was acquitted of the substantive RICO counts, but convicted of the conspiracy count. *Id.*
On appeal, he argued that there could be no finding of a conspiracy to violate RICO unless there
was a determination that he violated RICO's substantive provisions, as well. *Id.* at 61.

The Supreme Court rejected this argument stating that Salinas's interpretation of the
conspiracy statute was, plainly, wrong. *Id.* at 63. The Court explained that, "[i]n its "conventional"
usage, a conspiracy may exist "even if a conspirator does not agree to commit or facilitate each
and every part of the substantive offense." *Id.* Indeed, a person may be "liable for conspiracy even
though he was incapable of committing the substantive offense." *Id.* at 64. The Court concluded,
"even if Salinas did not accept or agree to accept two bribes, there was ample evidence that he
conspired because he knew about and agreed to facilitate the scheme. *Id.* at 66. Specifically, the
evidence showed that Salinas was the chief deputy responsible for managing the jail and
supervising custody of the prisoners. *Id.* at 55. When Marmolejo was not available, Salinas
arranged for the contact visits and on occasion stood watch outside the room where the visits took
place. *Id.*

Similarly, as set forth above in section I (A), there are ample allegations that Jimenez knew
about and agreed to facilitate the scheme. Even if Jimenez did not commit two predicate acts (it is
more than sufficiently alleged that he did), there was ample evidence that he conspired because he
knew about and agreed to facilitate the scheme. Among many other acts described in detail in the
Amended Complaint and summarized above, Jimenez arranged for and made the wire transfers to
and through SBCP for the benefit of the Founder Defendants and, knowing the "loans" were not

collateralized, misrepresented this fact to third parties to prevent detection of the true use and risk associated with the transfers. Jimenez knew about and agreed to facilitate the scheme.

Jimenez's fallback argument fairs no better. Jimenez contends that Plaintiffs' purported failure to allege "that the parties jointly discussed their knowledge and mutually agreed to intentionally conceal it, is fatal to the conspiracy claim." ECF No. 214 at 25. No such rule exists.

As the Eleventh Circuit explained in *Renta*, "[t]he existence of an agreement, as well as its objective, may be inferred from circumstantial evidence demonstrating 'that each defendant must necessarily have known that the others were also conspiring to participate in the same enterprise through a pattern of racketeering activity.'" *Id.* (citing *United States v. Browne*, 505 F.3d 1229, 1264 (11th Cir. 2007)). Notably, "this does not require proof that 'each conspirator agreed with every other conspirator ... [or] was aware of all the details of the conspiracy.'" *Id.* (citing *Starrett,* 55 F.3d at 1544). Rather, "participation in a conspiracy may be inferred merely from acts which furthered its object." *Id.* (holding that there was abundant circumstantial evidence that the object of the agreement was to conduct the enterprise's affairs through a pattern of racketeering activity, "to wit, a pattern of diverting money from [the enterprise] through transactions constituting the transmission and receipt of converted funds.").

As set forth above, and in great detail in the Amended Complaint, the object of the conspiracy was to embezzle money from the Debtor for benefit of the Founders. ECF No. 196 at ¶¶1-5, 8, 99-103, 151-154, 155-159. Defendant Jimenez agreed to the overall objective of the conspiracy and also agreed to commit at least two predicate acts in furtherance of the conspiracy. *Id.* at ¶ 253. Contrary to Jimenez's unsupported representation, evidence of his agreement to participate in the conspiracy need not be direct; rather, his participation may be inferred from his

myriad acts which furthered its object. The Amended Complaint details Jimenez's acts in furtherance of the conspiracy, and summarizes those acts in Count II as follows:

> Defendant Jimenez's participation in the conspiracy and predicate acts is evidenced by, among other things: his facilitation, orchestration, and/or execution of numerous transactions in furtherance of the purpose of the Enterprise; his knowing authorization and/or facilitation the fraudulent transfers through which the Insider Defendants embezzled funds from the Debtor's accounts, directly or indirectly, into SBCP and PA Marketing; his concealment of the true nature of myriad transfers in the Debtor's books and records; his participation in the drafting and documentation of promissory notes and corporate resolutions for the Debtor to fund the purchase of certain properties for the benefit of the Founder Defendants and falsely recording the nature of such transactions in PASP's books and records; his instructions to others, including Defendant Alos, to prepare false loan documents, or doing so directly himself, in furtherance of the purpose of the Enterprise; his rendering of further assistance to the Enterprise by diverting the prying eyes of the Debtor's financial institutions, auditors, and regulators and avoiding further scrutiny from such entities and authorities through misrepresentations concerning, among other things, the Debtor's financial positions, the nature of the SBCP Notes and the Debtor's collectability thereunder, and the nature of certain real property purchased with funds pilfered (through his knowing assistance) from the Debtor; his amendment of the 2017 SBCP Note to reflect guarantees from the Founder Defendants that of which he never saw, nor intended to see to the preparation; and his facilitation of the Round Trip Double Dip Transactions (Exhibit M) and related machinations of the SBCP obligations to the Debtor.

*Id.* From these allegations, it is apparent that Defendant Jimenez was not an unwitting participant in the looting of the Debtor. His participation and agreement, despite his alleged lack of benefit, are apparent from the allegations of the Amended Complaint.

### III.    Defendant Jimenez is Distinct from the Enterprise.

Jimenez contends that, as an employee of both the Debtor and the affiliated entities, he is not sufficiently distinct from the RICO enterprise—in this case an association-in-fact comprised of SBCP and PA Marketing, ECF No. 196 at ¶ 211—to satisfy § 1962(c). ECF No. 214 at 12-13. Jimenez is mistaken.

As the Supreme Court has made clear, an employee, such as Jimenez, is sufficiently distinct from the legal entity by which he is employed. *See Cedric Kushner Promotions, Ltd. v. King*, 533

U.S. 158, 161 (2001). In *King*, the Court explained: "RICO both protects a legitimate enterprise from those who would use unlawful acts to victimize it, and also protects the public from those who would unlawfully use an enterprise (whether legitimate or illegitimate) as a vehicle through which unlawful activity is committed." *King*, 533 U.S. at 161 (internal quotations and citations omitted). Accordingly, the Court held that Don King, an employee of the alleged enterprise Cedric Kushner Promotions, Ltd. "was distinct from the corporation itself, a legally different entity with rights and responsibilities due to its different legal status." *Id.* at 163. "After all," the Court stressed, "incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs." *Id.*

The Court went on to explain that the statutory history "not only refers frequently to the importance of undermining organized crime's influence upon legitimate businesses but also refers to the need to protect the public from those who would run "organization[s] in a manner detrimental to the public interest." *Id.* at 165 (citing S. Rep. No. 91-617, at 82). "This latter purpose," the Court clarified, "invites the legal principle we endorse, namely, that in present circumstances the statute requires no more than the formal legal distinction between "person" and "enterprise" (namely, incorporation) that is present here." *Id.*

So too here. Defendant's attempt to absolve himself from his criminal conduct by stating that he was an employee of the corporate entities that made up the enterprise is of no avail. Plaintiffs alleged that SBCP and PA Marketing, two distinct legal entities, formed an association-in-fact enterprise. ECF No. 196 at ¶211. It is undisputed that Defendant Jimenez was affiliated as an employee and executive of both SBCP and PA Marketing. This fact, however, does not absolve him from the criminal conduct in which he engaged, nor does the statute require more separateness

than the formal legal distinction between him as an employee and the legal entity for which he performed illegal services. As the Supreme Court made clear in *King*, "a corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern . . . of activity," § 1962(c), uses that corporation as a 'vehicle' whether he is, or is not, its sole owner." *Id*. at 165.

Accordingly, Defendant Jimenez's request that the Court dismiss the RICO counts asserted against him based on his "distinctiveness" defense, must be denied.

## CONCLUSION

For all the foregoing reasons, Defendant Jimenez's Motion to Dismiss the Amended Complaint should be denied.

Dated: July 8, 2024                **BAKER & MCKENZIE LLP**

*/s/ Adrienne Harreveld*
Mark D. Bloom (Fla. Bar No. 303836)
William V. Roppolo (Fla Bar No. 182850) (*pro hac vice*)
John R. Dodd (Fla. Bar No. 38091)
Jodi A. Avila (Fla. Bar No. 102787) (*pro hac vice*)
Benjamin C. Davis (Fla. Bar No. 110734) (*pro hac vice*)
Adrienne Harreveld (Fla. Bar No. 1035946) *(pro hac vice)*
Annasofia A. Roig (Fla. Bar No. 1018149) (*pro hac vice*)
1111 Brickell Avenue, 10th Floor
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953
Email: mark.bloom@bakermckenzie.com
        john.dodd@bakermckenzie.com
        william.roppolo@bakermckenzie.com
        jodi.avila@bakermckenzie.com
        benjamin.davis@bakermckenzie.com
        adrienne.harreveld@bakermckenzie.com
        annasofia.roig@bakermckenzie.com

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served simultaneously upon docketing on all counsel of record or pro se parties identified below via transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. mail on those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing in this case on July 8, 2024.

/s/ *Adrienne Harreveld*
Adrienne Harreveld

**Electronic Mail Notice List:**

The following is the list of persons or entities who are currently on the list to receive email notice/service for this case:

Brett M Amron, Esq. bamron@bastamron.com, mdesvergunat@bastamron.com, jmiranda@bastamron.com, kszolis@bastamron.com

Mark D. Bloom, Esq. mark.bloom@bakermckenzie.com, bkcyecf@bakermckenzie.com

Benjamin Cody Davis benjamin.davis@bakermckenzie.com

Lissette M Carreras lcarreras@bastamron.com, jmiranda@bastamron.com

John R. Dodd, Esq. john.dodd@bakermckenzie.com, bkcyecf@bakermckenzie.com

Jonathan S. Feldman feldman@katiephang.com, service@katiephang.com

Hunter James Grasso hgrasso@bastamron.com, jmiranda@bastamron.com;kszolis@bastamron.com

Adrienne Harreveld adrienneharreveld@bakermckenzie.com

Linda W Jackson ljackson@pardojackson.com, sramos@pardojackson.com; mfuentes@pardojackson.com

Laurie Uustal Mathews lmathews@leoncosgrove.com, bfinnegan@leoncosgrove.com

James B Miller bkcmiami@gmail.com

Annasofia Alexandra Roig annasofia.roig@bakermckenzie.com

Reginald Sainvil reginald.sainvil@bakermckenzie.com, bkcyecf@bakermckenzie.com

Andrew D. Zaron, Esq. azaron@leoncosgrove.com, eperez@leoncosgrove.com